ESTATE OF SIDNEY M. FRIEDBERG, DECEASED, DAVID P. GORDON AND LAURA RACHEL BURROWS, PERSONAL REPRESENTATIVES, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Estate of Friedberg v. Commissioner
Docket No. 2015-89
United States Tax Court
T.C. Memo 1992-310; 1992 Tax Ct. Memo LEXIS 330; 63 T.C.M. (CCH) 3080; June 1, 1992, Filed *330 Decision will be entered under Rule 155. Decedent owned shares in Fair Lanes, Inc. Certain of those shares were subject to a redemption agreement between decedent and Fair Lanes, Inc. Decedent transferred, within 3 years of death, certain life insurance policies to his daughter, who is named by his will as his personal representative. Decedent's will also provided for a $ 500,000 payment to decedent's wife, and provided that such bequest might, under certain circumstances, be delayed for up to 5 years. In that event, the bequest was to bear interest according to a formula set forth in decedent's will. On the estate tax return, petitioner estate claimed a deduction, as an administrative expense, for $ 375,000 in attorney's fees. Decedent's will provided for the establishment of two charitable lead trusts from which charitable contributions would be made. 1. Held: The value, for estate tax purposes, under sec. 2032, I.R.C., of the shares subject to the redemption agreement is $ 2,650,362. Held, further, the value, for estate tax purposes, under sec. 2032, I.R.C., of the shares not subject to any redemption agreement is $ 9,193,510.73. 2. Held, further, under *331 sec. 2035(a), I.R.C., the ratable portion of the proceeds of the life insurance policies attributable to payments of premiums made by decedent is includable in the gross estate. The entire proceeds are not, by virtue of the transferee's incidental status as decedent's personal representative, includable in the gross estate under secs. 2042(1) and 2035(d)(2), I.R.C.
3. Held, further, the fair market value of the bequest to decedent's wife (which qualifies as marital deduction property) is $ 500,000. Present value analysis is appropriate. See sec. 20.2056(b)-4(a) and (b), Estate Tax Regs. However, respondent has offered no evidence reasonably suggesting that a discount would be appropriate in this case. 4. Held, further, petitioner is entitled to deduct the $ 375,000 in attorney's fees claimed as an administrative expense on the estate tax return. 5. Held, further, in determining the funding of certain charitable lead trusts, and the consequent extent of petitioner's charitable contribution deduction, respondent improperly subtracted $ 1 million for administration expenses that were neither incurred nor paid by petitioner. Marc P. Blum, J. Ronald Schiff, and Jefrey S. *332 Weingrow, for petitioner. Sandra M. Jefferson, for respondent. HALPERN
HALPERN
MEMORANDUM FINDINGS OF FACT AND OPINION HALPERN, Judge: Respondent determined a deficiency in petitioner's Federal estate tax liability of $ 1,501,428.02. The issues for decision are: (1) The value, for estate tax purposes, under section 2032, [1] of decedent's 942,471 shares of Fair Lanes, Inc. stock subject to a redemption agreement between decedent and Fair Lanes, Inc.; (2) the value, for estate tax purposes, under section 2032, of decedent's 2,443,458 shares of Fair Lanes, Inc. stock not subject to the redemption agreement; (3) whether this Court has jurisdiction for a claim of equitable recoupment and, if so, whether petitioner estate, under that doctrine, is entitled to an offset against any Federal estate tax due, as a result of an asserted overpayment of fiduciary income taxes; (4) whether section 2042(1) or section 2035, as amended by the Economic Recovery Tax Act of 1981, Pub. L. 97-34, 95 Stat. 172, requires the inclusion of the entire proceeds of six life insurance policies transferred by decedent, within 3 years of death, to his daughter who also is named by his will as his personal representative; *333 (5) the fair market value of a bequest to decedent's wife of $ 500,000, which qualifies as marital deduction property, when the will authorized a delay, under certain circumstances, of up to 5 years, in satisfying such bequest; (6) whether petitioner estate is entitled to deduct, as an administrative expense, an attorney's fee in excess of the $ 230,000 allowed in respondent's notice of deficiency; and (7) whether respondent properly subtracted $ 1 million from petitioner's probate estate for the purpose of determining the funding of two charitable lead trusts and, consequently, petitioner's charitable contribution deduction. FINDINGS OF FACT Some facts have been stipulated and are so found. The stipulation of facts filed by the parties and accompanying exhibits are incorporated by this reference. Petitioner *334 (the Estate) is the estate of Sidney M. Friedberg (decedent). Decedent was a resident of Baltimore, Maryland, when he died on February 9, 1985. Petitioner's personal representatives are David P. Gordon and Laura Rachel Burrows. At the time the petition in the instant case was filed, both of petitioner's personal representatives resided in Baltimore, Maryland. Our findings of fact are by necessity extensive, due to the numerous valuation reports concerning the estate tax value of certain corporate shares of stock at issue. I. Valuation of the Shares
A. Fair Lanes
At the time of decedent's death, Fair Lanes, Inc. (Fair Lanes), a Maryland corporation, was the largest independent operator of bowling centers in the United States, operating 105 centers in 19 States. In addition, Fair Lanes operated a chain of restaurants and owned 47 percent of the publicly traded common stock of BTR Realty, Inc. (BTR), a Maryland-based real estate developer. Until shortly before his death, decedent was chairman of the board of Fair Lanes. At the time of his death, decedent was the largest single shareholder of Fair Lanes common stock. Included in the value of decedent's gross estate *335 were certain shares of Fair Lanes stock that were subject to a redemption agreement (the redemption shares) and certain other shares of Fair Lanes stock that were not subject to any redemption agreement (the nonredemption shares). Of the nonredemption shares, 394,736 had been beneficially owned by decedent (by way of a grantor trust) at the time of his death,while 2,048,722 shares had been owned directly by him at death (the nontrust, nonredemption shares). There were 2,443,458 nonredemption shares in total included in the value of the gross estate. Neither the redemption shares nor the nonredemption shares were "registered" within the meaning of the Securities Act of 1933, ch. 38, tit. I, 48 Stat. 74 (current version at 15 U.S.C. secs. 77a-77aa (1988)). Both the redemption shares and the nonredemption shares constituted "restricted securities" under Rule 144, as promulgated by the Securities & Exchange Commission, 17 C.F.R. sec. 230.144 (1991). Fair Lanes common stock was traded on the over-the-counter (OTC) market. The mean between the closing high bid and low asked prices, as reported by National Association of Securities Dealers Automated Quotation System, on February 8, *336 1985 (the day before decedent's death), was $ 5.875. On August 8, 1985, Fair Lanes stock closed at a bid price of $ 5.25 and an asked price of $ 5.50, with a mean of $ 5.375. Relevant financial data respecting Fair Lanes (and its subsidiaries) are as follows: Balance Sheet as of June 30, 1985 (In thousands of dollars)
Assets:  Current assets    Cash and short term investments      $ 12,119 Notes and accounts receivable      1,132
Inventories      1,883
Prepaid expenses      1,553
Land held for sale      234
Deferred income taxes      952
Notes and accounts receivable    1,682
Investments    4,602
Property and equipment less accumulated    depreciation and amortization      91,294
Excess cost of business acquired    1,114
Other assets and deferred charges    1,233
Total assets  $ 117,798
Liabilities and Stockholders' Equity:  Current liabilities    Current maturities of long-term debt &      capital lease obligations        2,035
Accounts payable      3,253
Accrued expenses      7,847
Long-term debt, less current maturities    notes payable      47,225
Long-term capital lease obligations,    less current maturities      4,580
Deferred credits    5,808
Stockholders' equity    less common stock held in treasury      47,050
Total liabilities  $ 117,798
*337 - - year ending June 30 - -
Other Financial Data
1983
1984
1985
Gross revenues
$ 76,053
$ 84,281
$ 93,120
Operating profit
16,247
17,895
18,110
Income before extra-
ordinary items 5,926
6,115
6,095
Depreciation/amortization
4,448
5,015
5,984
of property and equip. Capital expenditures
12,235
18,767
21,033
for property and equip. [1]Operating Margin 21.4%
21.2%
19.4%
B. The Redemption Agreement
On August 22, 1984, Fair Lanes and decedent entered into an agreement for the redemption at death of certain of decedent's shares of Fair Lanes then owned by him. That agreement (the Redemption Agreement) was negotiated at arm's length between decedent and the independent directors on the Fair Lanes Board of Directors (the Board). The terms of the Redemption Agreement required decedent's personal representatives to sell, and Fair Lanes to purchase, 942,471 shares [2] of decedent's Fair Lanes stock *338 at a price equal to 80 percent of the mean value between the closing high bid and low asked prices on the date before decedent's death. That resultant value is $ 4.70 (which is 80 percent of $ 5.875) a share. Under the Redemption Agreement, Fair Lanes was permitted to pay for the shares (1) in cash; (2) by issuing a promissory note; or (3) by a combination of the previous two methods. Fair Lanes elected to pay to petitioner $ 522,665.60 in cash (which payment was made on November 8, 1985) and to give to petitioner a note with a face value of $ 3,906,948.10 (the Note). *339 According to the Redemption Agreement, decedent was willing to sell the stock in order to provide his estate with sufficient liquidity to pay estate taxes and Fair Lanes was willing to purchase the shares: (1) Because such shares could be obtained at a discount and (2) in order to maintain stability in the market price of Fair Lanes' stock, by avoiding the introduction of decedent's significant block of shares into the public market. The Redemption Agreement contained several provisions to ensure that the redemption of decedent's shares would not result in an undue financial burden on Fair Lanes. Those provisions include: (1) A dollar limit on the number of shares Fair Lanes would be required to purchase at the agreed per share price (total cost to Fair Lanes not to exceed $ 5 million plus 10 percent of Fair Lanes' net worth in excess of $ 40 million); (2) the option to pay the purchase price immediately or over a 5-year period; [3] and (3) the further option, upon the exercise of the option to pay over a 5-year period, to defer any payments of principal, to the extent that such payments would exceed 15 percent of annual "cash-flow". "Cash-flow" is defined for such purpose as net *340 income plus depreciation and amortization for Fair Lanes' most recent fiscal year. [4]
The Board unanimously approved the Redemption Agreement. Subsequently, the Redemption Agreement was approved by the shareholders of Fair Lanes. Drexel, Burnham, *341 Lambert, Inc., provided a fairness opinion stating that a 20-percent discount on the block of 942,471 redemption shares was fair. C. The Valuation Date
On the estate tax return, decedent's personal representatives elected the alternate valuation date provided for in section 2032. D. The Credit Agreement
On March 9, 1984, Fair Lanes and Maryland National Bank (the Bank) executed a Revolving Line of Credit Agreement (the Credit Agreement). That agreement was amended on December 27, 1985, and again on June 30, 1986. The Credit Agreement provided a restriction safeguarding against a significant decline in the holdings of Fair Lanes' stock by decedent or the Estate. It states in pertinent part: (h) [If the Bank determines,] in its sole and absolute judgment, that there has been a significant decline in the shareholdings of [Fair Lanes] stock owned by Sidney M. Friedberg or Silvia F. Nachlas [decedent's sister], or their respective estates; then * * * the Notes shall become and be immediately due and payable at the option of the Bank without notice or demand. * * *
Thus, if the Estate were to dispose of its holdings in Fair Lanes in such a way as to constitute *342 a "significant decline", within the meaning of the Credit Agreement, the Bank would be entitled to demand immediate payment on the Note. E. The 1971 Offering
On or about February 2, 1971, Fair Lanes made a public offering (the 1971 offering) of 190,000 shares [5] of Fair Lanes common stock, at a price of $ 10 per share, with net proceeds to Fair Lanes and to the selling shareholders of $ 9.10 per share, after underwriters' commissions, but before legal, accounting, and printing costs were taken into account. [6] The bid and asked prices for Fair Lanes stock for the 2 months prior to February 2, 1971, reflect a mean bid-asked price of $ 13.125 per share. From January 1, 1971, until January 31, 1971, the mean bid-asked price remained at, or above, $ 13 per share. On January 25, 1971, the stock was bid and asked at $ 13.250 and $ 14.250, respectively, for a mean of $ 13.750. On February 1, 1971, the stock's price fell to $ 10 bid, $ 10.50 asked. [7] However, on April 12, 1971, the bid and asked prices were $ 15 and $ 15.50, respectively. *343 F. The Baker-Watts Report
Prior to filing the estate tax return, petitioner retained David P. Simpson (Simpson) of Baker, Watts and Co., Inc. (Baker-Watts), to value the block of stock not subject to the Redemption Agreement (the nonredemption shares) as of August 9, 1985 (the alternative valuation date applicable thereto). At that time, Simpson was Vice President of Corporate Finance for Baker-Watts. Simpson submitted a valuation report (the Baker-Watts Report) on November 8, 1985. In addition, Simpson later authored a rebuttal report (the Baker-Watts Rebuttal) challenging the reasoning and conclusions of the report prepared by respondent's expert. Simpson is a recognized expert in the field of securities valuation. His testimony at trial and the Baker-Watts Reports were accepted by respondent as expert testimony. Simpson considered, among others, the following factors: (1) The size of the block of nonredemption shares (the Estate Block) in relation to total shares publicly held; (2) average daily trading volume; (3) the market price of Fair Lanes stock; (4) whether the Estate Block constitutes a control block of Fair Lanes; (5) the dollar value of the Estate Block; *344 (6) general market trends and market trends in Fair Lanes stock itself; (7) industry trends; (8) the earning capacity of the Estate Block; and (9) Fair Lanes' capacity to pay dividends. Simpson arrived at the following conclusions: (1) The Estate Block is large when compared to the average daily volume of Fair Lanes shares traded; [8] (2) the price level of Fair Lanes stock shows short term price movements occurring substantially independently of the market; [9] (3) the dollar value of the Estate Block at the market price on August 9, 1985, is high, compared to the average total value of Fair Lanes stock traded daily during the period of January 1, 1983, through September 30, 1985; and (4) both earnings per share and the price of the stock have risen since fiscal 1980, with dividends increasing over the same period, although the outlook for the bowling industry is comparatively stable. *345 In addition, Simpson considered Baker-Watts' experience as a market maker in Fair Lanes stock. Such experience revealed that trades in Fair Lanes stock are predominantly to individual investors; there is little institutional interest. [10] Moreover, Simpson concluded, it is Baker-Watts' experience that the sales of even small blocks of shares can substantially move the market price of Fair Lanes stock. Thus, Simpson concluded that it would not be possible to place the Estate Block in the public market in a reasonable period of time without substantially discounting the price per share from the market price. Simpson concluded that a secondary offering or a private placement would be necessary, and that either would require a substantial discount from the prevailing market price. *346 As to the extent of the discount, the Baker-Watts Report provides little particularized reasoning. The Baker-Watts Report takes as a starting point the Redemption Agreement, which provided for a 20-percent discount from the market price. Reasoning that a greater discount would be required for the Estate Block, insofar as that block is 2.5 times the size of the block of redemption shares, the Baker-Watts Report concludes that a discount of 30 percent would be appropriate (which would be a per share price of $ 3.7625 as of August 9, 1985). G. The Ferris-Baker-Watts Report
The successor firm to Baker-Watts, Ferris, Baker Watts, Incorporated (Ferris-Baker-Watts), reviewed the Baker-Watts Report in a report dated November 9, 1990 (the Ferris-Baker-Watts Report). That report was prepared by Todd L. Parchman (Parchman), who is a senior vice president of Ferris-Baker-Watts and currently heads its investment banking effort. Mr. Parchman is a recognized expert in the field of securities valuation and both his testimony at trial and the Ferris-Baker-Watts Report prepared by him were accepted by respondent as expert testimony. Parchman came to the conclusion that there is no material *347 fallibility in the logic of the Baker-Watts report and that a 30-percent blockage discount is appropriate. Thus, the Ferris-Baker-Watts Report agrees that the per share value should be $ 3.7625 as of August 9, 1985. Parchman based that conclusion upon the following: (1) The limited existing public market for the shares; (2) the assumption that the market price of the shares at the valuation date represented an unbiased estimate of the economic value of the shares in a liquid market at the then-current trading volumes and with no material inside information distorting share prices; (3) the determination that a secondary offering of the shares on the valuation date could not have achieved a price greater than a private placement of the shares; [11] (4) the determination that the shares could not by themselves have given a buyer control over the affairs and management decisions of Fair Lanes; and (5) the determination that a buyer of the shares would have had limited liquidity in terms of resale potential. *348 Concluding that a private placement would be the best way to dispose of the shares, Parchman next considered what a private investor might pay for such shares. Parchman therefore considered how such investor might hope to realize a return on his investment. Parchman observed that, insofar as that investor would lack control of Fair Lanes, that investor could not be assured of achieving a return on his investment through dividends, sale of company assets, liquidation, or merger. Parchman also considered the prospects of a purchaser's realizing a profit by selling the shares, and found that that strategy, too, was problematic. Parchman concluded that the purchaser, under a private placement, would require a substantial discount, due to the lack of liquidity of his investment. Parchman concluded that a 30-percent illiquidity discount would be appropriate. [12]
*349 H. The Whitman Report
The Estate obtained an appraisal dated November 9, 1990 (the Whitman Report), from Alexander D. Greene (Greene) of Whitman, Heffernan, Rhein & Co., Inc., who appraised the value of both the redemption shares and the nonredemption shares. Greene is a recognized expert in the field of securities valuation. Both Greene's testimony at trial and the Whitman Report, prepared by Greene, were accepted by respondent as expert testimony. 1. The Redemption Shares
The Whitman Report determines the value, as of February 9, 1985, of the redemption shares to be the present value of the sum of (1) $ 522,666 in cash, payable 30 days following the filing of the estate tax return; (2) a note with a face amount of $ 3,906,948.10 (as heretofore described); and (3) cash dividends attaching to the redemption shares from February 9, 1985, to the payment date. The Whitman Report considers the following factors: (1) The terms of the Redemption Agreement, including the price, and any other consideration, to be paid for the redemption shares; (2) the timing of the filing, by the Estate, of its Federal estate tax return following the death of decedent; (3) the terms of the *350 Note, including its maturity, rate of interest, payment schedule, financial covenants, reporting requirements and the likelihood that payments of principal would be deferred; (4) remedies available to the holder of the Note upon a default by the issuer; (5) the underlying financial standing of the issuer at the time the Note was made and its future prospects; (6) the marketability of the Note and the ability of the holder to obtain financing using such Note as collateral; (7) the universe of prospective purchasers for the Note; and (8) yields available on comparable securities as of February 1985. Certain observations of the Whitman Report, in considering the aforesaid factors, are noteworthy. a. Financial Condition and Future Prospects
The Whitman Report observes that Fair Lanes was in satisfactory financial condition on June 30, 1985. Fair Lanes had total assets of approximately $ 117,798,000 and stockholders' equity of approximately $ 47,050,000. However, according to the Whitman Report, Fair Lanes' operating margins declined from 18.4 percent in 1983, to 17.8 percent in 1984, and to 15.7 percent in 1985 (year ending June 30). [13] The Whitman Report also notes that, for *351 the 3 years ending June 30, 1985, Fair Lanes' capital expenditures exceeded depreciation by a factor of three. Thus, the Whitman Report draws the conclusion that, in 1985 and for the then-foreseeable future, cash from operations was likely to be dedicated largely to capital expenditures in an attempt to increase market share and reverse declining margins. [1]4 The Whitman Report also indicates that, with long-term debt and capital lease obligations of $ 51.8 million, representing 52 percent of Fair Lanes' long-term capitalization, Fair Lanes was more highly leveraged than certain of its principal competitors. Profits in 1985 seemed likely to be flat or mildly decline for the then-foreseeable future. *352 b. Valuation of the Note
The good financial condition of Fair Lanes, in 1985, notwithstanding, the Whitman Report concludes that the quality of the Note is, and would be viewed by a prospective third party purchaser as, quite poor. The Whitman Report bases this conclusion primarily on the following: (1) The terms of the Note, insofar as it is unsecured, offer no meaningful governance provisions for the Holder, and have limited default protections and (2) the limited market for purchase and resale of the Note. (1) Terms of the Note
The Whitman Report observes that loan governance provisions, such as financial covenants, represent the principal means by which a creditor can monitor and assure the continuing integrity, or safety, of his investment. Where an issuer is experiencing a change in its financial standing, voluntary or involuntary, covenants protect creditors in advance, or upon the occurrence, of circumstances adverse to their interests. [15] The note here at issue contains no meaningful financial covenants. Accordingly, the issuer is at liberty to subordinate the Note to existing and future claims. [1]6 *353 Default provisions as to both the holder's particular security, and as to the issuer, generally, also are common. In particular, a cross-default provision is effective in protecting a creditor's rights. [17] The note at issue contains no cross-default protection and the cure period for nonpayment is, according to the Whitman Report, well in excess of reasonable standards. [1]8 In sum, the Whitman Report concludes, the absence of protective covenants or adequate default provisions materially *354 increases the risk of nonpayment of the Note. (2) Limited Market for Purchase and Resale
The Whitman Report also observes that an investment's attractiveness is inversely proportional to the ease with which the investor can execute his exit strategies -- in this instance, selling the Note or using it as collateral to obtain financing for some more attractive investment. Accordingly, the Whitman Report concludes that the attractiveness of the note at issue is decreased because the limited market for such securities makes exiting difficult. The Whitman Report determines: (1) Since the note is not registered, no public market exists for its sale; (2) institutional investors would likely consider the investment too speculative, based upon the aforementioned terms of the Note; and (3) few wealthy individuals (or special purpose funds having governance provisions permitting such type of investment) would have a sufficiently vast portfolio to be willing to undertake a risky investment of this size. [19]
*355 Moreover, the Whitman Report states, the price a buyer is willing to pay for a security is determined by the manner in which he can finance the purchase. Since an institutional lender or commercial finance company would be reluctant to advance substantial funds, on a nonrecourse basis, with the Note as collateral, it would be quite difficult for most buyers to secure needed financing. (3) Yields on Comparable Securities
The Whitman Report provides examples of various securities available to a buyer on January 31, 1985. The Whitman Report illustrates Government bonds ranging from short term, yielding 10.18 percent, to long term, yielding 11.36 percent; corporate bonds ranging from ranking Aaa, yielding 12.08 percent, to Baa, yielding 13.26 percent; high yield debt, per the Salomon Brothers High Yield Debt Index, yielding 15.97 percent; and securities of troubled issuers, rated Caa, yielding 18.25 percent. Comparing the Note to High Yield Securities, the Whitman Report concludes that the Note is substantially inferior, due to its lack of the following qualities likely possessed by High Yield Securities: (1) Protection of the Trust Indenture Act; [20] (2) covenant protection; *356 (3) disclosure requirements; (4) identifiable repayment schedules; [21] and (5) a market for purchase and sale. The Whitman Report concludes that an investor would require an additional 9 percent, above the approximately 16 percent yielded by the Salomon Brothers collection of high-yield securities, to purchase such a note. Thus, the Whitman Report concludes, the interest rate on the Note ought to be 25 percent and the value of the nonredemption shares, overall, $ 2,175,000, or $ 2.31 per share. *357 2. The Nonredemption Shares
a. How to Dispose of the Shares
The Whitman Report considers four potential avenues for disposing of the nonredemption shares, namely: (1) Secondary offering; (2) sale to Fair Lanes; (3) Rule 144 sale; and (4) private placement. (1) Secondary Offering
Noting that the shares owned by decedent's sister, Mrs. Sylvia Nachlas, comprised approximately 46 percent of the Adjusted Common Stock (adjusted to account for Fair Lanes' repurchase of the redemption shares outstanding as of August 9, 1985 (approximately 5.6 million of 12.1 million shares)), the Whitman Report states that, assuming a commonality of interest, the Estate and Mrs. Nachlas clearly could have influenced the Board to consider a registration of the nonredemption shares. However, the Whitman Report concludes that such action would be complicated, expensive, and potentially adverse to the interests of Mrs. Nachlas and Fair Lanes, because: (1) Such secondary offering would likely take on the characteristics of a private placement because of the very limited ability of the market to absorb additional shares and the consequent need to place large blocks of shares with underwriters; *358 [22] (2) it is unlikely Mrs. Nachlas would lobby for registration solely for the benefit of the Estate, given the need to consider the future treatment of her own shares; and (3) the costs of a secondary offering substantially would fall upon the Estate and Mrs. Nachlas, which would reduce the present value of their interests. The Whitman Report concludes that no meaningful number of nonredemption shares could be disposed of by a secondary offering. (2) Sale to Fair Lanes
The Whitman Report quickly disposes of the possibility of a sale to Fair Lanes. There was no arrangement by which the Estate could require Fair Lanes to purchase the nonredemption shares. Moreover, as *359 the Whitman Report observes, the provision in the Redemption Agreement providing that Fair Lanes would not be obligated to purchase shares comprising more than 40 percent of the shares included in the value of the gross estate suggests a lack of interest by Fair Lanes in acquiring such additional shares. (3) Rule 144 Sale
The Whitman Report concludes that a sale under Rule 144 of the Securities Act of 1933 (SEC Rule 144), 17 C.F.R. sec 230.144 (1991), would be feasible. However, SEC Rule 144 would impose certain restrictions, since the Estate would be considered an "affiliate" of Fair Lanes: The Estate would not be permitted to sell, during any rolling 3-month period, more than the greater of (1) 1 percent of the outstanding shares of common stock, or (2) the average weekly trading volume of the common stock for the 4 weeks preceding notice of the sale of shares under SEC Rule 144. [23] With the restrictions of SEC Rule 144 in mind, the Whitman Report essentially performs a present value calculation of the cash expected to be generated by a prospective sale of those shares. *360 That present value calculation is premised upon the following assumptions: (1) To the extent that the Estate must hold shares until disposed of over time, it would be unable to capture built-in gains, mitigate losses, or take advantage of other investment opportunities, thereby making the shares less valuable than if unrestricted; (2) sale of the shares would begin immediately, in August 1985; (3) the mean bid-asked price per share would increase 9 percent per annum; and (4) dividends would be received at a quarterly rate of $ 0.04 per share held on the alternate valuation date. Taking the above into account, the Whitman Report determines that an investor purchasing that stream of income would require a return of 25 percent on his investment. Consequently, the Whitman Report concludes that the value of the free shares would be approximately $ 8,725,000, if sold pursuant to SEC Rule 144, which sale would occur over an approximately 5-year period. (4) Private Placement
The Whitman Report determines that private placement would be a feasible means of disposing of the nonredemption shares. In determining what an investor would pay for such shares, the Whitman Report notes that *361 such shares would remain unregistered and therefore subject to SEC Rule 144, thereby limiting an investor's ability to dispose of them and reducing their worth to that investor. The assumptions applying to the SEC Rule 144 sale are applied in the private placement scenario as well, except that an investor with at least 10 percent of the common stock would be required, under SEC Rule 144, to satisfy a 2-year holding period in order to sell any shares (the Estate, in contrast, had already fulfilled such requirement), and thereafter would be subject to the volume restrictions noted previously (until such time as that investor both held less than 10 percent of the outstanding shares and satisfied a 3-year holding period). Taking the above into consideration, the Whitman Report concludes that the nonredemption shares, if sold by private placement, would be worth approximately $ 7,250,000. b. Conclusion
The Whitman Report concludes that the fair market value of the nonredemption shares is $ 8,500,000. I. The IRS Report
Mr. Ellis A. Evans (Evans) prepared a report (the IRS Report), undated, and testified as an expert on behalf of respondent. The parties stipulated that Evans *362 is an expert on the valuation of securities. Mr. Evans' report and testimony at trial were accepted as expert testimony by petitioner. 1. The Redemption Shares
Evans noted that, during the years 1983 to 1985, cash-flow was more than adequate to cover yearly payments in conformity with the Note. Nonetheless, Evans assumed, for evaluation purposes, that the principal of the Note would be paid in a single payment at maturity. Thus, Evans' analysis boiled down to a present value analysis and the question of how the Note's face amount should be apportioned between principal and unstated interest. In the absence of any Fair Lanes publicly traded debt instruments or a ranking, by a leading financial service, of the credit worthiness of Fair Lanes, Evans reviewed private placement debt of companies having comparable common stock investment rankings. Fair Lanes' common stock had been assigned an A-minus ranking by Standard & Poor's. Observing that the debt issues, within a near time of February 9, 1985, of other companies with an A-minus common stock ranking averaged to 12.91 percent, Evans rounded slightly, discounting the true yield on the Note to 13 percent and estimating the *363 value of the Note, having an ostensible interest rate of 10.5 percent, [24] therefore, to be $ 3,508,439.39. Evans did not review the particular debt instruments of the other companies having an A-minus common stock ranking. The IRS Report does not rest upon the assumption that such other companies are otherwise comparable to Fair Lanes. Evans used a valuation date of August 9, 1985. At trial Evans stated that his report was erroneous insofar as it failed to compensate for a period, from August 9, 1985, to December 8, 1985, for which no interest would be paid; Evans stated that adjusting for this factor would reduce his valuation by approximately *364 $ 170,000. Evans did not state what the worth of the Note would be if February 9, 1985, were deemed the valuation date. 2. The Nonredemption Shares
After reviewing the Estate's status as an "affiliate" and the revolving credit agreement with the Bank, the IRS Report considers three potential methods of disposing of the nonredemption shares. The IRS Report considers the respective potentials of: (1) A purchase by Fair Lanes; (2) a private offering; and (3) a secondary offering. The IRS Report concludes that a purchase by Fair Lanes would not be the best option. The IRS Report determines that the price of such shares to Fair Lanes would have been in line with the going market. At a value of $ 5.375 for each of 2,443,458 shares, the total cost, according to the Report, would have been $ 13,133,586.75. Observing that Fair Lanes' total cash and cash equivalent position was $ 12.1 million on August 9, 1985, the IRS Report reasons that Fair Lanes would have required additional financing from the Bank. Thus, Fair Lanes would have been required to draw upon some portion of the $ 22.5 million balance of the revolving line of credit. Observing that a review of the June 30, 1985, *365 Annual Report to Stockholders indicated a working capital position of $ 4.7 million, and a ratio of current assets to current liabilities of 1.36 to 1.00, the IRS Report concludes that there was a high probability that the full purchase price would have been financed by bank borrowings. The IRS Report observes that that option would have best achieved the goal of maintaining continuity of ownership, increasing the remaining large stockholder's position from 23.5 percent to 28.8 percent, but considers the likelihood of such scenario questionable due to the uncertainty of the Bank's approval and cooperation. The IRS Report also concludes that a private offering would not be the best option. Conceding that a sale to a single or syndicate purchaser would be possible, the IRS Report determines that a purchaser interested in a large holding would not have viewed favorably the near equal status of the other large stockholder and that such lack of control would have made it difficult to place the block as a unit. The IRS Report determines that a secondary offering was the most likely means by which petitioner might have disposed of the nonredemption shares. The IRS Report suggests that *366 such was a desirable option because a secondary offering would not have reduced the proportionate ownership of the other large stockholder, Mrs. Nachlas. Moreover, although the Bank's approval would be required, additional financing would not. Thus, the transaction would be less complex than a sale to Fair Lanes. The IRS Report states that a secondary offering would not have been unusual for Fair Lanes, insofar as there had been a secondary offering in 1971. Conceding that the Estate's block of nonredemption shares was insufficient to compel management to file a registration statement, the IRS Report determines that "the combination of the Estate's shares and those held by the other large stockholder [Mrs. Nachlas] would have had sufficient influence to effect a registration." Thus, the IRS Report turns to the question of what might have been received for the nonredemption shares in a secondary offering. Evans considered the success of the 1971 secondary offering and reviewed the market data of 19 companies with secondary offerings set forth in appendix II thereof. Those secondary offerings were marketed from June 28, 1985, to August 22, 1985. The companies were chosen *367 solely based upon the time at which they had secondary offerings and not upon any other comparability to Fair Lanes. The IRS Report observes that the changes in market values of such companies, per share, ranged from positive 18.2 percent to negative 28.8 percent during the 30 days prior to the offering. Of the 19 offerings examined, 8 declined, 8 advanced, and 3 were unchanged. The average change was a decline of 2.2 percent. The IRS Report concludes that the equal number of advancing and declining values demonstrates overall bull market conditions. Using the Dow Jones Industrial Average as a proxy for the market, the IRS Report determines that the market increased approximately 9 percent between May and July of 1985 (the average increased to 1360 from 1250). The IRS Report thus determines that the rising market for equities was sufficiently positive to offset price declines normally ascribable to offering announcements. The IRS Report determines that "There were no correlations among various factors affecting market impact such as: Size of the offering relative to total capitalization, and number of shares sold compared to the average weekly trading volume 4 weeks prior to *368 sale." Taking into account: (1) That the nonredemption shares constituted approximately 148.0 times Fair Lanes' average reported weekly trading volume; (2) that the nonredemption shares constituted 18.2 percent of the total outstanding shares; (3) that the Standard & Poor's investment quality ranking was "A-"; and (4) the direction of the overall equity market, the IRS Report determines that, following an announcement of a secondary offering, Fair Lanes' stock would have declined in value 5.0 percent, an adjustment described by the IRS Report as modestly above the average decline of all sales listed in appendix II. Similarly, the IRS Report averages the commission cost of all 19 comparison stocks sold and arrives at a figure of 5.8 percent. Thus, the IRS Report concludes that taking into account market impact and selling commissions, the nonredemption shares would have sold at $ 4.80 per share, for a total value of $ 11,728,598. J. The Baker-Watts Rebuttal
In addition to preparing the Baker-Watts Report, Simpson reviewed the IRS Report and prepared a rebuttal, dated March 17, 1988 (the Baker-Watts Rebuttal or the Rebuttal). As noted earlier, the Baker-Watts Rebuttal was *369 accepted by respondent as expert testimony. The primary purpose of the Rebuttal was to challenge the reasoning and conclusions of the IRS Report, respecting the value of the nonredemption shares. The Rebuttal emphasizes that a private placement was the only realistic option for disposing of the nonredemption shares. That point largely is made by arguing that a secondary offering was not a feasible option. In so arguing, the Rebuttal makes the following points. 1. The 1971 Offering is irrelevant to the prospects of a successful offering in 1985, since the factors influencing trading volume and otherwise affecting a secondary offering would have been different at that time. 2. Investor interest in Fair Lanes was too low. Discounting the IRS Report's reliance on the Standard & Poor's stock ranking of Fair Lanes, the Rebuttal determines that a better indication of investor interest would be average weekly trading volume as a percentage of total shares outstanding (trading volume to total shares ratio). Upon consideration of that factor, the Rebuttal determines that investor interest in Fair Lanes was insufficient to support a secondary offering. [25]
*370 3. The comparison companies described in the IRS Report are not comparable to Fair Lanes. The Rebuttal bases this determination on consideration of: (a) Each company's industry; (b) the purpose of the offering; (c) the proportion of selling shareholders; and (d) the financial history of the company. The Rebuttal observes that none of the IRS comparison companies operates in Fair Lanes' industry. The Rebuttal also observes that it is harder to "sell" a secondary offering when only shareholders are selling, because there is no prospect of the company using new funds to somehow improve or grow and, further, because insider selling arouses public suspicion of an undisclosed fundamental weakness in the company. [26] Further, the Rebuttal observes that only two of the IRS comparable companies had lower compound growth rates in sales, earnings, and earnings per share. The Rebuttal opines that this factor alone would have rendered a secondary offering nearly impossible. *371 4. The Dow Jones Industrial Average does not suggest that a secondary offering would have been well received by the market. The Rebuttal bases that conclusion on the results of a regression analysis which, it argues, show a negative correlation between the Dow and the price of Fair Lanes stock. [27]
5. There is no indication that management would have been willing to file a registration statement. While the shares of decedent's sister, Sylvia Nachlas, combined with those controlled by the Estate, would have sufficed to compel registration, the Rebuttal considers it uncertain that she *372 would have done so, since the registration of a secondary block of stock normally depresses the price of the stock and, therefore, such action would not have been in the best interest of Fair Lanes. The Rebuttal also argues that, for valuation purposes, the distinction between a company purchase and a private placement is irrelevant. The Rebuttal bases that conclusion on the observation that the fiduciary responsibility of Fair Lanes' directors would have precluded them from offering more than an outside party would have offered. Moreover, the Rebuttal notes that the company might not have been a willing buyer and certainly would not have been compelled to purchase the nonredemption shares. The Rebuttal also disagrees with the IRS Report's conclusion that a private placement would not be feasible due to the working control of the shares held by Sylvia Nachlas. The Rebuttal asserts that private placements are regularly performed for companies even though control of the company is not part of the bargain. [28] The Rebuttal adds that the public market does not normally perceive a private placement as evidence of company weakness, as it does a secondary offering. Based upon Baker-Watts' *373 overall experience as a market maker, the Rebuttal determines that the nonredemption shares could have been sold, through private placement, at a 30-percent discount or $ 9,193,510.73 ($ 3.7625 per share). K. The Potomac Report
The Estate obtained a report (the Potomac Report) dated November 9, 1990, from Robert E. Long (Long) and Arthur J. Phelan, Jr. (Phelan), of Potomac Asset Management, Inc. (Potomac), who jointly appraised the fair market value of the redemption shares and the nonredemption shares and reviewed all the other appraisals submitted in this matter. Respondent accepted Long's and Phelan's testimony at trial, as well as the Potomac Report, as expert testimony. 1. The Nonredemption Shares
A substantial portion of the Potomac Report is devoted to an analysis of the conclusions of the IRS Report. The Potomac Report considers, *374 among other factors: (1) The 1971 offering; (2) the bowling industry downturn; (3) Fair Lanes' financial and market position; (4) stock buyer focus in the 1980's; (5) comparable companies selected by the IRS Report; (6) the IRS' procedural analysis of a secondary offering; (7) pricing and discount effects on a public offering; and (8) factors affecting downward pressure on price. a. The 1971 Secondary Offering
According to the Potomac Report, the 1971 offering does not constitute recent evidence that a secondary offering would have been feasible. Moreover, the Potomac Report notes that shortly before the offering, Fair Lanes stock listed at 13.25 bid and 14.25 asked, but the offering for 190,000 shares at $ 10 per share (including 160,000 shares offered by shareholders and 30,000 shares offered by the company) only yielded net proceeds, to the company and the selling shareholders, of $ 9.10 per share, before deducting legal and accounting expenses. Thus, the Potomac Report observes, the net offering proceeds were approximately 30 percent below the prior market price. Moreover, that offering was substantially smaller than the approximately $ 12 million offering contemplated *375 in 1985. The Potomac Report suggests that, even if the 1971 offering were relevant to how a 1985 offering might have fared, the 1971 offering would suggest net offering proceeds per share substantially less than the per share market price, even if all other factors were equal. The Potomac report further notes, however, that several factors were not equal, but were less favorable in 1985 than in 1971. (1) The Bowling Industry Downturn
The Potomac Report notes that in 1971 bowling still was viewed as a growth industry but, by 1985, the sport had lost appeal, revenues were declining, and it had failed to attract new players. (2) Fair Lanes' Financial and Market Position
The Potomac Report notes that, in 1971, selling at $ 10 per share, Fair Lanes was still a small company capable of appealing to individual, small investors hoping the company might grow dramatically. By contrast, the Potomac Report observes, Fair Lanes, by 1985, was the biggest independent of its field, tied inextricably to the industry's overall rate of growth, which was widely believed to have ended. b. Stock Buyer Focus in the 1980's
The Potomac Report states that the market was very fad oriented *376 in the 1980's. Outside of small growth companies (which Fair Lanes, by 1985, was no longer), the market was interested in technological, biological/medical, and other previously unexploited industries. Companies in more mundane, non-fad-related areas, had a difficult time getting investor or analyst attention. Thus, the Potomac Report states that the bull market of the 1980's was largely confined to certain areas and did not extend to nongrowth companies outside "fad-approved" areas. c. Comparable Companies Selected by the IRS Report
The Potomac Report emphasizes the lack of comparability between the 19 companies with secondary offerings selected by the IRS Report and Fair Lanes. The Potomac Report observes: (1) that 7 of the 19 companies are in, or closely related to, health and personal care, a perennially favored industry area; (2) that most of the nonmedical companies appear to be operating in innovative ways in much larger industry segments; (3) that 3 of the 19 companies are in the radio/TV/video industry, too big a ratio given the particularly favored status of that industry in the 1980's; and (4) that the particular industries constituting the sample are so heavily *377 represented because it is difficult to sell large noncontrol blocks of shares in low-performing, mundane, mature industries without grossly diluting the price of the stock. Thus, the Potomac Report concludes, the 19 companies selected by the IRS Report are not comparable to Fair Lanes and the discount from market value of 5 percent assumed by Evans from such sample is without reasonable foundation. d. The IRS' Procedural Analysis of a Secondary Offering
Preliminarily, this portion of the Potomac Report concurs with the IRS Report's observations that the market for a stock takes a "wait and see" attitude upon the announcement of a secondary offering, to determine the reasons for such sale and that brokers may withhold recommendations of such stock to their clients. The Potomac Report agrees that this may result in some downward pressure on the price of the stock. The Potomac Report further agrees that the commission compensation to brokers is higher for secondary offerings. The Potomac Report disagrees, however, with the IRS Report's conclusion that this downward pressure would have resulted in just a 5.0-percent (26.9 cent per share) decline in the value of Fair Lanes stock. *378 The Potomac Report reiterates the distinction between Fair Lanes and respondent's comparison group of trendy industries, in vogue with stock players at that time. e. Pricing and Discount Effects on a Public Offering
The Potomac Report reiterates that buyer hesitancy and apprehension before an offering can lower the market price and adds that sellers will further sweeten the offering (by lowering the price of the shares) to insure that the secondary offering is successful. Moreover, many underwriters will pressure the seller to offer a sweetener, so that it can promise its clients a substantive immediate gain after the offering. The legal and accounting costs often influence the seller to offer such a sweetener: by the time the final price is set, the seller has ordinarily invested approximately $ 250,000 in legal and accounting costs for medium size offerings, all arising from SEC requirements. Such preparatory work quickly becomes outdated and must be redone if the seller waits too long. Thus, the Potomac Report concludes, sellers faced with the choice of accepting a lower price or retreating from a secondary offering are likely to choose the former. The Potomac Report *379 concludes that both downward pressures (due (1) to buyer hesitancy and (2) to sweetening the deal) are cumulative, and each should cause a minimum 10-percent decline in price. Thus, a seller in a secondary offering would typically have to accept a discount of at least 20 percent, and easily in excess of that figure. The Potomac Report notes that the 1971 secondary offering occasioned approximately a 30-percent decline. f. Factors Affecting Downward Pressure on Price
(1) The Size of the Offering
Of the 19 offerings listed in the IRS Report, the Potomac Report concludes, only 4 involve a larger percentage of the company being sold than the "truly large" 20.1 percent of Fair Lanes represented by the nonredemption shares (after taking into account the redemption of 942,471 shares, pursuant to the Redemption Agreement). Of those four, the Potomac Report dismisses two as noncomparable because the companies are large companies listed on the New York Stock Exchange (NYSE) and would be likely candidates for purchase by institutional money managers, whereas Fair Lanes is clearly not an institutional stock, with only a small proportion of its shares being institutionally held. *380 A third company is dismissed as noncomparable because of its heavy trading, which caused its offering to constitute less than the equivalent of 10 weeks' trading, at reported levels. Only one company is considered somewhat comparable to Fair Lanes, but it too had a substantially greater average weekly volume as a percentage of old shares than Fair Lanes (1.3 percent compared to .68 percent). [29] Even so, the price of that company's stock fell by 11.4 percent in the 30-day period prior to the offering. (2) Overall Market Conditions
The Potomac Report observes that Fair Lanes historically has not moved with the overall market. The Potomac Report further states *381 that, if the relation is not merely nondirect but inverse, then investors in a 1980's bull market could be expected to liquidate Fair Lanes stock in order to buy the hotter stocks that were fashionable in the 1980's. (3) Investment Quality
The Potomac Report criticizes the IRS Report's reliance on Standard & Poor's monthly stock guides for determining the value of the nonredemption shares, stating that an immense number of Wall Street analysts and professional money managers have jobs precisely because there is no single and agreed upon method of determining which stocks are good buys. The Potomac Report observes that while some less sophisticated brokers, not otherwise given to much research, and some self-taught individuals may rely on such rankings, "It is virtually certain that the underwriting partners and syndicate managers use other yardsticks, and never consider this particular rating." The Potomac Report further notes that Standard & Poor's scoring system is based on per share earnings and dividend records over a 10-year period, even though many stock speculators almost disregard any information more than 2 years old. Moreover, the Potomac Report observes, the dividend *382 on Fair Lanes stock for the year ending June 30, 1985, was 16 cents, which, at a price of $ 5.375, represents a yield of only 2.9 percent. Given that stocks are purchased not only based upon anticipated price appreciation, but also based upon current dividend yield, that rate of return, according to the Potomac Report, is quite low. [30] Thus, the only reason an investor would purchase Fair Lanes would be the expectation of future growth. Yet, Standard & Poor's investment rating of A- cannot be considered a good guide to future growth. The Potomac Report points out that Standard & Poor's itself explicitly warns against using its ratings for that purpose: A ranking is not a forecast of future market price performance. * * * These rankings must not be used as market recommendations. A high-score stock may at times be so overpriced at to justify its sale, while a low-score stock may be attractively priced for purchase.
The Potomac Report also notes that this was unlikely, insofar as Fair Lanes was no longer a small company with great growth potential; by contrast, Fair Lanes was the biggest independent of its field, tied to an industry that had declined in popularity since *383 1971. Further, the Potomac Report notes, underwriters would take account of the low dividends and poor likelihood of future growth and, hoping not to disappoint their clients, be more likely to depress the price in order to insure an early built-in gain for those clients. Thus, the underwriters would sell the stock on the basis that it was cheap, both historically and prospectively. With the foregoing in mind, the Potomac Report prices the nonredemption shares by three different methods: (1) Price-earnings ratio; (2) extrapolation from decline following "vulture run-up" after decedent's death; and (3) extrapolation from the 1971 offering. Determining that a purchaser would accept a price-earnings ratio of no more than eight to one, and based upon last year's reported earnings of 45 cents per share, the Potomac Report determines a price of $ 3.60 per share *384 using the price-earnings ratio method. [31] Turning to the "vulture run-up" method, the Potomac Report observes that the stock dropped $ 1.875 even after it was realized that decedent's death would not alter the status quo, or adversely affect Fair Lanes' performance. Had there been a secondary offering before that information could be known, the Potomac Report estimates that there would have been an additional decline of 25 cents on that account. Thus, the Potomac Report concludes that a drop of $ 2.125 would have been a fair expectation due to: (a) Withheld buying by the brokerage industry and expanding selling; (b) the underwriter's determination that a sweetener would be needed; or (c) some combination of both. Such decline would be measured from the post-death market price of $ 5.875 per share and suggests an offering price of $ 3.75 per share. Extrapolating from the 1971 offering yields a slightly higher, but similar, figure. [32] The Potomac Report observes that, in 1971, Fair Lanes stock dropped from $ 13.75 to $ 10 in just 7 business days at the time of the offering, a discount of 27.3 percent. A 27.3-percent discount from the price of $ 5.375 on August 9, 1985, suggests *385 a price of $ 3.91 per share. [33]
Averaging the three estimates, the Potomac Report concludes that the fair market value of the nonredemption shares was $ 3.75 per share, before taking into account underwriting *386 and other fees. The Potomac Report agrees with the conclusions of the Ferris-Baker-Watts Report that an 8-percent commission and 2-percent cost for other fees was likely, noting by way of comparison that the selling shareholders in the 1971 offering incurred commissions of 9 percent and other fees of 6.3 percent. Thus, after deducting, from $ 3.75, $ .375 for commissions and other expenses (10 percent), the Potomac Report concludes that the nonredemption shares were worth $ 3.375 per share on August 9, 1985, or $ 8,246,671. 2. The Redemption Shares
The Potomac Report substantially agrees with the Whitman Report. Preliminarily, the Potomac Report agrees that the universe of potential buyers of the Note would be limited to buyers with a portfolio of at least $ 45 million, insofar as few if any investors would want more than 5 percent of their portfolios comprised of a speculative asset like the note in question. Further, the Potomac Report emphasizes that such investors would surely be sophisticated and have substantial legal, financial, and other advice, and probably fiduciary duties and Government rules regulating the type of investments they may purchase on behalf of the *387 owners of the capital pool. The Potomac Report determines that the total value represented by the redemption shares would equal the sum of the following, measured from February 9, 1985: (1) A cash payment of $ 522,666, received on November 8, 1985; (2) three dividends on the 942,471 redemption shares; and (3) the Note, with a face amount of $ 3,906,948, accruing interest from December 8, 1985, at a variable rate in accordance with that set by the IRS. a. The Cash Payment
The Potomac Report reasons that a hypothetical buyer of that payment would require 12-percent interest to be induced to turn away from negotiable instruments of equal or greater security. [34] Applying a 12-percent discount suggests a value of $ 480,338 for the cash payment. *388 b. The Dividends
Assuming dividends to continue to be 4 cents per share ($ 37,699), payable on the 15th of May, August, and November, and discounting at a rate of 1 percent per month, on account of the fact that such dividends would not be paid immediately, the Potomac Report determines the values of the three respective dividends to be $ 36,568, $ 35,437, and $ 34,306, respectively, for a total value of $ 106,311. c. The Note
The Potomac Report notes preliminarily that the Note was to begin earning interest on December 8, 1985, but was to be purchased for cash on February 9, 1985, 10 months earlier. The Potomac Report further notes that, since the Note was set to pay a variable rate of interest, a buyer would wish to be compensated for the risk that rates would fall and his property would decline in value. [35] Thus, a discount would be required. With the foregoing in mind, as well as the quality of the Note, including the lack of covenants and the poor default provisions, the Potomac Report turns to the question of what rate of return a buyer would require. Working with the table of yield/quality relationships of debt found in the Whitman Report, [36] and noting that *389 the aforementioned corporate rates apply only to rated bonds, the Potomac Report opines that most institutions are forbidden by charter or regulation from holding paper below "investment grade". Paper rated below Baa is not considered investment grade and is excluded automatically from most institutional portfolios. Therefore, such paper sells, to those who consider buying it, at a discount, compared to rated paper. Given that the note at issue also was unrated and since most "junk bonds" at the time were considered no worse a credit risk than Fair Lanes, the Potomac Report takes 16 percent as a starting point. The Potomac Report also takes into consideration that the Note: (1) Was not marketable; (2) lacked the legal protections that even most junk bonds had; (3) had a variable rate (unpredictable and therefore inferior to a fixed rate); and (4) was issued by a smaller company than most junk bond issuers known to Wall Street. In consideration of all the foregoing, the Potomac Report concludes that a buyer would require at least a 20-percent premium and, much more likely, a 25-percent to 50-percent premium. [37] Assuming a yield of 20 percent, the Potomac Report concludes *390 that the value of the Note would be $ 2,559,184 on December 8, 1985, and $ 2,176,611 on February 9, 1985. d. Conclusion
Overall, the Potomac Report concludes that the value of the redemption shares was *391 comprised of: (1) A cash payment with a present value of $ 480,338; (2) dividends with a present value of $ 106,311; and (3) a note with a present value of $ 2,176,611. The sum of these is a present value of $ 2,763,260 on February 9, 1985. Taking into account estimated brokerage fees of $ 112,898, [38] the Potomac Report concludes that a seller of petitioner's rights in the redemption shares could have received $ 2,650,362. L. The Rosenberg Report
Theodore Rosenberg, president of Twin Oaks Associates, Inc., performed an appraisal of the redemption shares (the Rosenberg Report). The Rosenberg Report concludes that value of the Estate's rights in the shares was equal to the sum of the values of: (1) The cash payment of $ 522,665.60, received on November 8, 1985; (2) the dividends; and *392 (3) the Note. In determining the proper interest rate for the Note, the Rosenberg Report considers: (1) The inherent cost of money, i.e., the real rate of interest; (2) the expectation of inflation by the marketplace; (3) the risk of nonpayment; and (4) the lack of marketability. Stating that the real rate of interest was about 4 percent and that anticipated inflation for intermediate-term debt instruments was 7 percent, the Rosenberg Report selects 11 percent as a starting point. Next, the Rosenberg Report adds a 33.3-percent risk premium to that rate, describing the Note as a totally unsecured subordinated debenture, for a rate of approximately 15 percent. Observing that recent issues of junk bonds yielded 14 to 16 percent, the Rosenberg Report determines the 15-percent figure to be within market bounds. Taking into account lack of marketability, the Rosenberg Report determines that an additional risk premium of at least 20 percent is appropriate. Absent any additional adjustments, the per share value would be $ 3.56. However, the Rosenberg Report also takes into account the possibility of deferral of principal payments by Fair Lanes. If Fair Lanes were to defer payments *393 to the maximum extent allowable, for 6 years, and given its likely illiquidity in such scenario, the per share value would be $ 2.33. Thus, the penultimate conclusion of the Rosenberg Report is that the per share value was between $ 2.33 and $ 3.56, depending upon whether Fair Lanes were to defer principal payments. Ultimately concluding that a 20-percent discount appropriately adjusted for the risk of deferral, the Rosenberg Report values the redemption shares at $ 3.24 per share, or $ 3,053,606.04. M. Valuation Summary
As a summary of the conclusions reached in the various valuation reports considered, and to aid in our analysis of the valuation issues, the following table summarizes those conclusions: Total Value
Per Share Value
Report
Redemption
Nonredemption
Redemption
Nonredemption
IRS
[1] $ 3,861,094.99 $ 11,728,598.40
$ 4.10
$ 4.80
Baker-Watts
N/A  9,193,510.73   N/A  3.7625  Rebuttal
N/A  9,193,510.73   N/A  3.7625  Ferris-Baker
Watts  N/A  9,193,510.73   N/A  3.7625  Whitman
2,175,000.00  8,500,000.00   2.31  3.48  Potomac
2,650,362.00  8,246,671.00   2.81  3.375  Rosenberg
3,053,606.04  N/A   3.24  N/A  *394 II. Equitable Recoupment
The Estate's personal representatives filed a fiduciary income tax return for the Estate for the taxable year ending January 31, 1986. On that return, the personal representatives reported gain realized and recognized to the Estate on the disposition of both the redemption shares and certain of the nonredemption shares distributed in satisfaction of certain pecuniary bequests. To determine the amounts of gain realized on such dispositions, the personal representatives used as the adjusted basis of the shares disposed of the value of such shares as determined for Federal estate tax purposes. III. Insurance Policies
On February 17, 1982, decedent transferred several life insurance policies (the Insurance Policies) having an aggregate death benefit of $ 125,589.66 (net of borrowings against the policies) to Laura Rachel Burrows. Decedent had previously paid $ 300,055.50 in premiums with respect to the Insurance Policies. From the date of the transfer, until decedent's death, Laura Rachel Burrows paid $ 34,489.34 of premiums with respect to the Insurance Policies. Petitioner reported on the estate tax return the ratable portion of the proceeds *395 of the Insurance Policies attributable to payments of premiums made by decedent, in the amount of $ 112,662.94. Respondent increased the portion of decedent's gross estate in the amount of $ 12,926.78. IV. The Marital Deduction Qualifying Bequest
Decedent provided for the payment of $ 500,000 to his wife as a bequest under the terms of his Last Will and Testament (the Will). The Will indicates a preference that such bequest be satisfied with assets other than Fair Lanes stock. The Estate's personal representatives were authorized to delay payment up to 5 years if such payment would otherwise require the sale of any Fair Lanes stock. In such event, the bequest was to bear interest, payable at least monthly, equal to the greater of (i) the usual statutory share of the income payable on this bequest pursuant to Section 7-304 of the Estates and Trusts Article [of the Annotated Code of Maryland] and (ii) seventy-five percent (75%) of the prime rate of interest established by the First National Bank of Maryland from time to time, on the outstanding balance of this bequest unpaid more than thirty (30) days after the date of the probate of my Will; provided further, however, *396 that the amount of such interest shall not be less than the amount necessary to qualify this bequest for the marital deduction for Federal Estate Tax purposes.
The parties have stipulated that the value of such bequest on the alternate valuation date qualifies for the marital deduction. V. Attorney's Fees
On Schedule J of the estate tax return, under administration expenses, petitioner claimed a deduction for $ 375,000 in attorney's fees. Petitioner called as an expert witness Eugene Schreiber, Esq. (Schreiber), an attorney who has practiced in the trusts and estates field in the Baltimore area for approximately 30 years. Schreiber testified as to the reasonableness of the attorney's fees claimed by petitioner. Schreiber testified that all the attorney's fees and expenses incurred and paid by the Estate were reasonable for the Baltimore, Maryland, area. His conclusions were based upon consideration of experience and ability of the attorneys, the complexity of the issues involved, the size of the estate, and the amount of time required for administration. He also observed that the fees charged by petitioner's attorneys were at their usual billing rates and were well *397 within the range of rates in the Baltimore community. VI. Charitable Contribution Deduction
Decedent's will provides for the establishment of two charitable lead trusts, from which charitable contributions would be made. Accordingly, the extent of petitioner's charitable contribution deduction is dependent upon the extent to which such trusts are funded. [39] In determining the contributions to such trusts, respondent subtracted, in addition to the administration expenses allowed in the Notice of Deficiency, an additional $ 1 million for administration expenses that it estimated have been or will be deducted on the Estate's fiduciary Federal income tax returns. The parties have stipulated that no such administration expenses were so deducted, as of January 31, 1990. ULTIMATE FINDINGS *398 OF FACT 1. The value of the redemption shares is $ 2,650,362. 2. The value of the nonredemption shares is $ 9,193,510.73. OPINION I. The Redemption Shares
A. The Correct Valuation Date
Initially, the parties cannot agree as to the date on which to value the redemption shares. Section 2031 provides that the value of the gross estate of the decedent is to be determined at the time of his death. In pertinent part, section 2032 provides: (a) General. -- The value of the gross estate may be determined, if the executor so elects, by valuing all the property included in the gross estate as follows: (1) In the case of property distributed, sold, exchanged, or otherwise disposed of, within 6 months after the decedent's death such property shall be valued as of the date of distribution, sale, exchange, or other disposition. (2) In the case of property not distributed, sold, exchanged, or otherwise disposed of, within 6 months after the decedent's death such property shall be valued as of the date 6 months after the decedent's death.
The decedent died on February 9, 1985. On the estate tax return, his personal representatives elected to value the gross estate *399 pursuant to section 2032. On the estate tax return, the redemption shares were treated as if disposed of on February 9, 1985, pursuant to the Redemption Agreement. The parties have stipulated that the valuation date for the redemption shares is February 9, 1985. Nonetheless, respondent submits that, despite that stipulation, August 9, 1985, is the proper date to value the shares, relying on Estate of Critchfield v. Commissioner, 32 T.C. 844 (1959), and illustrating her point with Rev. Rul. 77-180, 1977-1 C.B. 270. Respondent's stipulation (which we will address presently) aside, her reliance on Estate of Critchfield v. Commissioner, supra, is misplaced. There, the Court held that even though an executor was bound by a local probate court order to sell property to a decedent's widow at its date of death value, the property was nonetheless includable in the estate at fair market value on the date of the sale (alternate valuation having been elected). In that case, there was no binding sale agreement, insofar as the estate was required to sell but the widow was not required to purchase the property. Similarly, *400 in Rev. Rul. 77-180, supra, where decedent's will directed the executor to convey certain property to a specific beneficiary, under certain circumstances, and where the property had value in excess of $ 45,000 on both the date of death and the date of distribution, there was no binding sale agreement, insofar as the specific beneficiary was not required to purchase that property. Accordingly, both Estate of Critchfield and Rev. Rul. 77-180 are distinguishable from the present case, which involves a binding sale agreement that constitutes no less than a fait accompli as of February 9, 1985. Furthermore, section 20.2032-1(a)(1), Estate Tax Regs., provides that, under the alternate valuation method, the property included in decedent's gross estate on the date of death is valued as of the date on which it is first distributed, sold, exchanged, or otherwise disposed of. Section 20.2032-1(c)(3), Estate Tax Regs., states, in pertinent part: If a binding contract for the sale, exchange, or other disposition of property is entered into, the property is considered as sold, exchanged, or otherwise disposed of on the effective *401 date of the contract, unless the contract is not subsequently carried out substantially in accordance with its terms. The effective date of a contract is normally the date it is entered into (and not the date it is consummated, or the date legal title to the property passes) unless the contract specifies a different effective date.
Here, it is clear that the "effective date" of the Redemption Agreement was the date of decedent's death, February 9, 1985. The contract is on its face binding, obligating the parties as of the death of decedent. Thus, notwithstanding that it contemplated various conditions to be met before consideration was to change hands, the effective date of the contract was not later than February 9, 1985, the date of decedent's death. February 9, 1985, is the date upon which the redemption shares must be valued. Sec. 20.2032-1(a)(1), (c)(3), Estate Tax Regs. Finally, Rule 91(e) provides that "A stipulation shall be treated, to the extent of its terms, as a conclusive admission by the parties" and may not be qualified, changed or contradicted by a party thereto except where justice requires. Respondent argues that the stipulation is internally inconsistent, *402 insofar as it acknowledges that petitioner elected the alternate valuation date of August 9, 1985, and states the valuation date of the redemption shares is February 9, 1985. Accordingly, respondent
urges that we must interpret the stipulation so as to remove any ambiguity or inconsistency. SeeKirchner, Moore & Co. v. Commissioner, 54 T.C. 940, 944 n.2 (1970), affd. 448 F.2d 1281 (10th Cir. 1971). However, we perceive neither an ambiguity nor an inconsistency in the stipulation at issue insofar as it declares the valuation date for the redemption shares to be February 9, 1985: [40] respondent, unquestionably, has agreed that petitioner may value the redemption shares as of February 9, 1985. Moreover, that result is appropriate, in light of section 20.2032-1, Estate Tax Regs. Accordingly, justice requires that respondent be bound by her stipulation. The redemption shares are to be valued as of February 9, 1985. *403 B. The Value of the Redemption Shares
Generally, whether determined as of the time of decedent's death under section 2031 or, alternatively, under the rules of section 2032, the value of an item of property included in the gross estate is its fair market value. Sec. 20.2031-(1)(b), Estate Tax Regs. As stated, the Redemption Agreement between decedent and Fair Lanes required decedent to sell, and Fair Lanes to buy, at 80 percent of their mean value on the day before decedent's death, certain of decedent's shares of Fair Lanes. Fair Lanes was permitted to pay for the shares with either cash, a note, or a combination of both. The value of the redemption shares equals the sum of the values of: (1) The $ 522,666 cash payment, received November 8, 1985; (2) three Fair Lanes dividends, payable quarterly; and (3) the Note. The sum of those three values constitutes the value of petitioner's "bundle of rights" in the redemption shares on February 9, 1985. Petitioner produced several expert opinions evaluating that bundle of rights. Respondent produced one expert opinion evaluating that bundle of rights. We would add that this Court is not bound by the opinion of expert witnesses *404 and may make a determination based upon all the evidence presented. Estate of Holl v. Commissioner, 95 T.C. 566, 570 (1990). Petitioner bears the burden of proof concerning the appropriate value of petitioner's interest in the redemption shares. Rule 142(a); Estate of Gilford v. Commissioner, 88 T.C. 38, 50-51 (1987). Preliminarily, we observe that notes are valued at the full remaining indebtedness, unless there is reason for a discount. Sec. 20.2031-4, Estate Tax Regs. Discounts are supported by factors such as insufficiency of underlying security or arrearage of interest or taxes. SeeKronenberg v. Commissioner, 64 T.C. 428, 436-437 (1975); Rev. Rul. 67-276, 1967-2 C.B. 321. Specifically, risk of nonpayment is a valid consideration in discounting a note. SeeKronenberg v. Commissioner, supra at 437. Turning to the expert opinions, we find the IRS Report to be unconvincing. That report found the value of the redemption shares to be $ 4,031,094.99. [41] As described earlier, the IRS Report compares the Note to the private placement debt of companies whose only *405 commonality with Fair Lanes was an A-minus common stock investment rating by Standard & Poor's. However, there is no indication that a company's stock ratings are helpful in assessing the quality of its debt. To the contrary, as noted in the IRS Report, Standard & Poor's warns against confusing the two types of ratings. Relative quality of bonds or other debt * * * cannot be applied to common stocks, and therefore rankings are not to be confused with bond quality ratings which are arrived at by a necessarily different approach.
Moreover, Evans, the IRS expert, did not review the particular debt instruments of the comparable companies, which instruments almost certainly are noncomparable to the Note at issue. Thus, his method consisted of comparing noncomparable debt instruments of noncomparable companies and suggesting *406 a comparable interest rate. Further, Evans failed directly to consider several important factors that clearly are relevant to determining the value of the Note, notably the lack of marketability, the lack of covenants, the lack of adequate default provisions, and the comparison to junk bonds. The approach of the IRS Report, therefore, not only is flawed insofar as it goes, but does not go far enough, in comparison to petitioner's experts, who employed somewhat more direct analyses. Overall, the IRS Report is of little if any probative value, respecting the proper valuation of the redemption shares. Consequently, we turn to the three reports of petitioner's experts, evaluating the redemption shares. Initially, we note that both the Whitman Report and the Potomac Report seem particularly complete, insofar as they have thoroughly examined the lack of covenants, the lack of meaningful default provisions, the lack of marketability, and the comparison to junk bonds. While the Rosenberg Report is better than the IRS Report, it gives no attention to the Note's lack of covenants or inadequate default provisions. Thus, the Rosenberg Report, though somewhat instructive, is substantially *407 less probative than the Whitman and Potomac Reports, to which we chiefly turn for guidance. Recall that those three reports determine the value of the redemption shares as follows: Report
Value of Redemption Shares
Whitman
$ 2,175,000.00
Potomac
2,650,362.00
Rosenberg
3,053,606.04
While we are mindful that this Court is not bound by expert testimony, Estate of Holl v. Commissioner, 95 T.C. 566 (1990), we are persuaded that the proper value of the redemption shares lies within the range of petitioner's experts' reports. We note that, unlike all the other reports, the Rosenberg Report is not premised upon the assumption that the principal payments would be deferred. According to the Rosenberg Report, the effect of that assumption would be a per share value of $ 2.33, which comes to a total value of $ 2,195,957.43, a value within the range established by the Whitman and Potomac Reports. Thus viewed, the Rosenberg Report buttresses the conclusion that the value of the redemption shares lies somewhere between the $ 2,175,000 and $ 2,650,362 figures determined by the Whitman and Potomac Reports, respectively. Within that range however, we are unable *408 to pick a precise figure, insofar as the valuation process is largely an art as well as a science. Thus, in light of petitioner's burden of proof, Estate of Gilford v. Commissioner, supra at 50-51, we are unable to conclude that the redemption shares were worth less than the higher figure, arrived at in the Potomac Report. Accordingly, we determine the value of the redemption shares, as of the proper valuation date, February 9, 1985, to be $ 2,650,362. II. The Value of the Nonredemption Shares
Preliminarily, we address respondent's contention that this Court, in evaluating the nonredemption shares, should consider events subsequent to August 9, 1985. Specifically, respondent urges us to consider sales of Fair Lanes stock that took place on October 1, 1985, and December 29, 1986, which sales indicated per share values of $ 4.75 and $ 9.13, respectively. Respondent relies on Estate of Kyle v. Commissioner, 94 T.C. 829 (1990), Messing v. Commissioner, 48 T.C. 502, 512 (1967), and Estate of Jung v. Commissioner, T.C. Memo. 1990-5. It would be enough, we think, to observe that those cases *409 do not support respondent's argument. We would add, however, that "subsequent events are not considered in fixing fair market value, except to the extent they were reasonably foreseeable at the date of valuation." Estate of Gilford v. Commissioner, 88 T.C. 38, 52 (1987) (citations omitted). Inasmuch as respondent has failed to demonstrate how the above sales (or the events leading thereto)might reasonably have been foreseen on August 9, 1985 (much less how such supposedly foreseeable events would not have been reflected in the market price at that time), we hold such subsequent events to be irrelevant to the fair market value of the nonredemption shares on August 9, 1985. Generally, fair market value is the price at which property would change hands between a willing buyer and willing seller, neither being under any compulsion to buy or sell, and each having reasonable knowledge of the relevant facts. United States v. Cartwright, 411 U.S. 546, 551 (1973); sec. 20.2031-1(b), Estate Tax Regs. More specifically, section 20.2031-2(b)(1), Estate Tax Regs., provides: In general, if there is a market for stocks or bonds, on a stock exchange, *410 in an over-the-counter market, or otherwise, the mean between the highest and lowest quoted selling prices on the valuation date is the fair market value per share or bond. If there were no sales on the valuation date but there were sales on dates within a reasonable period both before and after the valuation date, the fair market value is determined by taking a weighted average of the means between the highest and lowest sales on the nearest date before and the nearest date after the valuation date. * * *
Where actual sales are not available within a reasonable proximity of the valuation date, section 20.2031-2(c), Estate Tax Regs., provides: the fair market value may be determined by taking the mean between the bona fide bid and asked prices on the valuation date, or if none, by taking a weighted average of the means between the bona fide bid and asked price on the nearest trading date before and the nearest trading date after the valuation date, if both such nearest dates are within a reasonable period. * * *
Accordingly, the parties and their experts agree that the starting point of the valuation analysis is the mean per share market price of $ 5.375 (the average *411 of the highest quoted asked price of $ 5.50 per share and the lowest quoted bid price of $ 4.25 per share on August 9, 1985). [42] That observation, however, does not conclude the analysis. Section 20.2031-2(e), Estate Tax Regs., provides that certain other factors may also be considered: In certain exceptional cases, the size of the block of stock to be valued in relation to the number of shares changing hands in sales may be relevant in determining whether selling prices reflect the fair market value of the block of stock to be valued. If the executor can show that the block of stock to be valued is so large in relation to the actual sales on the existing market that it could not be liquidated in a reasonable time without depressing the market, the price at which the block could be sold as such outside the usual market, as through an underwriter, may be a more accurate indication of value than market quotations. * * *
*412 The parties are in agreement that, given the large block of restricted shares in question, some blockage discount is in order. The parties simply disagree as to the proper extent of that discount. Respondent reminds us that petitioner bears the burden of proof in this regard. Rushton v. Commissioner, 498 F.2d 88 (5th Cir. 1974), affg. 60 T.C. 272 (1973); Maytag v. Commissioner, 187 F.2d 962 (10th Cir. 1951). Respondent further points out that such blockage discount must not duplicate the market's own discount. Estate of Gilford v. Commissioner, supra at 58 n.25. With the foregoing in mind, the stage is set for our consideration of the expert opinions provided by the parties. To recap, the various experts determined the following values for the nonredemption shares: Report
Total Value
Value Per Share
IRS
$ 11,728,598.40
$ 4.80  Baker-Watts
9,193,510.73
3.7625
Ferris-Baker-Watts
9,193,510.73
3.7625
Whitman
8,500,000.00
3.48  Potomac
8,246,671.00
3.375 We note, initially, that the IRS report is unconvincing. In determining the appropriate blockage discount, the IRS Report *413 ignores most of the factors considered by petitioner's experts (industry trends, market trends, the size of the offering, etc.) and, instead, relies chiefly upon a comparison to the mean blockage discount in the stock of other companies having secondary offerings at about the same time (June 28, 1985, to August 22, 1985). Such companies were not chosen on the basis of any comparability with Fair Lanes. Moreover, the blockage discounts of those 19 secondary offerings are too few to suggest a "typical" blockage discount; and, in any event, the IRS Report does not consider whether Fair Lanes was sufficiently typical for a supposedly typical blockage discount to be relevant. Thus, the IRS Report presents insufficient evidence for us to conclude that the average results of the listed 19 companies' secondary offerings reflect the likely result of a secondary offering by Fair Lanes. The IRS Report provides, at best, the basis for a rational guess in the absence of any additional information. However, there is additional information and that information suggests that there is no basis for comparison between many of the 19 companies listed by the IRS Report and Fair Lanes. As observed *414 by the Potomac Report, many of those companies were involved with industries that were particularly fashionable in the 1980's, whereas the bowling industry had lost appeal. Moreover, as the largest independent of its field, Fair Lanes would not have been attractive as a growth stock and, insofar as its dividend of 16 cents per year represented a yield of only 2.9 percent, was also an unattractive investment in terms of present return. The determination of the IRS Report, that a 5-percent discount in price would be appropriate, is of little or no use in valuing the nonredemption shares. The IRS Report utilizes the same flawed analysis in estimating a 5.8-percent commission cost: without specifically reviewing the factors likely, in a particular case, to affect the commission cost, the IRS Report simply averages the commission costs respecting the 19 "comparison" secondary offerings. That is not the basis of a reasonable estimate, particularly when, as the Potomac Report observes, many of the companies making the secondary offerings clearly are not comparable to Fair Lanes. Consequently, we turn to the reports and testimony of petitioner's experts for guidance in evaluating the *415 nonredemption shares. We note, at the outset, that there is substantial agreement among those experts as to the value of the nonredemption shares. Not only do the Baker-Watts and Ferris-Baker-Watts Reports reach the same conclusion (a value of $ 9,193,510.73), but none of the other reports suggests any material shortcoming in either the Baker-Watts Report or the Ferris-Baker-Watts Report. Each of those reports considers all or most of the following: (1) The size of the block of nonredemption shares; (2) market trends; (3) industry trends; (4) growth potential and earning capacity of the shares; and (5) limited liquidity of the shares in the hands of a purchaser acquiring shares other than through secondary offering. While we are mindful that this Court is not bound by expert opinion, Estate of Holl v. Commissioner, 95 T.C. 566 (1990), we are persuaded that the proper value of the nonredemption shares lies within the range established by the reports of petitioner's experts. Within that range, however, we are unable to pick a precise figure. In light of petitioner's burden of proof, Estate of Gilford v. Commissioner, 88 T.C. 38, 50-51 (1987), *416 we are unable to conclude that the nonredemption shares were worth less than the greatest reasonable estimate provided -- the determination of the Baker-Watts and the Ferris-Baker-Watts Reports.[43] Accordingly, we determine the nonredemption shares to be worth $ 9,193,510.73, as reported on the estate tax return. III. Petitioner's Equitable Recoupment Claim
Petitioner contends that, to the extent we determine the fair market values of the redemption *417 shares or the nonredemption share to be greater than the respective values reported by petitioner on the estate tax return, petitioner is entitled to a refund under the doctrine of equitable recoupment. [44] Because we have determined that the fair market value, of both the redemption shares and the nonredemption shares, does not exceed that stated on the estate tax return, we have no occasion to consider petitioner's claim for equitable recoupment. However, in this regard, see United States v. Dalm, 494 U.S. 596,    , 110 S. Ct. 1361, 1370 n.8 (1990). *418 IV. The Life Insurance Policies
The transfer of the insurance policies from decedent to Laura Rachel Burrows on February 17, 1982, occurred within 3 years of decedent's death, which was on February 9, 1985. Petitioner contends that, under section 2035(a), it is taxable only on the ratable portion of those insurance proceeds attributable to the percentage of total premiums paid by decedent on the insurance policies in question. Respondent counters that, under sections 2035(d) and 2042(1), all of the insurance proceeds are includable. Section 2035(a) provides: Except as provided in subsection (b), the value of the gross estate shall include the value of all property to the extent of any interest therein of which the decedent has at any time made a transfer, by trust or otherwise, during the 3-year period ending on the date of the decedent's death.
Petitioner contends it is settled law that, under section 2035(a), only a ratable portion of insurance proceeds, relating to the portion of the premiums paid by decedent, is includable in the Estate. See, e.g., Estate of Silverman v. Commissioner, 61 T.C. 338 (1973), affd. sub nom. In re Estate of Silverman, 521 F.2d 574 (2d Cir. 1975). *419 Respondent counters by arguing that, however correct petitioner's analysis may have been before 1981, the amendments to section 2035, made by the Economic Recovery Tax Act of 1981 (the 1981 Act), Pub. L. 97-34, section 424, 95 Stat. 172, 317, require a different result. Section 2035(d), added by the 1981 Act, provides in pertinent part: (1) In general. -- Except as otherwise provided in this subsection, subsection (a) shall not apply to the estate of a decedent dying after December 31, 1981. (2) Exceptions for certain transfers. -- Paragraph (1) of this subsection * * * shall not apply to a transfer of an interest in property which is included in the value of the gross estate under section 2036, 2037, 2038, or 2042 or would have been included under any of such sections if such interest had been retained by the decedent.
Thus, in cases such as the one at issue, where decedent has died after December 31, 1981, section 2035(a) initially is nullified by section 2035(d)(1), but is resurrected, to some degree, by section 2035(d)(2). Respondent argues that under section 2035(d)(2), added by the 1981 Act, any insurance proceeds includable in the gross estate under section *420 2042(1) are includable under section 2035(a). Respondent further argues that under section 2042(1), as opposed to section 2035, prorating is not required. SeeEstate of Leder v. Commissioner, 893 F.2d 237, 239 (10th Cir. 1989), affg. 89 T.C. 235 (1987). Thus, respondent contends, if the insurance proceeds are includable under section 2042(1), they are includable, in their entirety, under section 2035. [45]
*421 Initially, we note that, unless the changes wrought by the 1981 Act require a different result, petitioner will prevail. Estate of Silverman v. Commissioner, supra, requires that those insurance proceeds exceeding the ratable portion attributable to premiums paid by decedent are excludable. Thus, we consider respondent's argument that sections 2035(d) and 2042(1) require a different result. We first consider whether section 2042(1) is applicable to the facts of this case. Section 2042(1) provides that the gross estate shall include the value of all property "To the extent of the amount receivable by the executor as insurance under policies on the life of the decedent." Here, Laura Rachel Burrows received the proceeds of the Insurance Policies in her capacity as an individual, and not in her capacity as executor; thus, the pertinent inquiry is whether the term "executor" in section 2042(1) refers broadly to anyone who happens to be an executor of the estate, or whether it refers, more narrowly, to one receiving a transfer qua executor. The regulations make clear that the term "executor" is to be interpreted in a narrow sense. Section 2042 provides *422 for the inclusion in a decedent's gross estate of the proceeds of insurance on the decedent's life (i) receivable by or for the benefit of the estate (see paragraph (b) of this section), and (ii) receivable by other beneficiaries (see paragraph (c) of this section). * * * [Sec. 20.2042-1(a)(1), Estate Tax Regs.; emphasis added.]
Inasmuch as insurance proceeds "receivable by other beneficiaries" are wholly the domain of section 2042(2), proceeds are only includable under section 2042(1) if "receivable by or for the benefit of the estate." Clearly, those proceeds received by Laura Rachel Burrows in her individual capacity were not received by or for the benefit of the Estate. Accordingly, section 2042(1) does not apply. We hold that respondent erroneously increased decedent's gross estate by $ 12,926.78. [46]
*423 V. The Marital Deduction Qualifying Bequest
A. Applicability of Present Value Analysis
Petitioner's position is that the Will's specific bequest of $ 500,000 must be taken at face value, and that no discount factor may be applied to allow for the possible delay in payment of up to 5 years. Petitioner asserts that, under section 2056, the Estate is entitled to a deduction for the full value of any property passing to the spouse of decedent (to the extent such property was included in the gross estate). Petitioner contends that respondent has no statutory basis for arbitrarily imputing a minimum rate of return, arguing that under section 20.2056(b)-5(f), Estate Tax Regs., an interest transferred in trust, for example, is not required to bear interest at any minimum rate. Respondent argues that the value to decedent's spouse of a future payment (assuming delay) necessarily must be less than the value to decedent's spouse, on that date, of an immediate payment. Therefore, respondent contends that a discount is in order. [47] Section 20.2056(b)-4, Estate Tax Regs., entitled "Marital deduction; valuation of interest passing to surviving spouse." supports respondent's position. *424 That regulation provides in part: In determining the value of the interest in property passing to the spouse account must be taken of the effect of any material limitations upon her right to income from the property. An example of a case in which this rule may be applied is a bequest of property in trust for the benefit of the decedent's spouse but the income from the property from the date of the decedent's death until distribution of the property to the trustee is to be used to pay expenses incurred in the administration of the estate. [Sec. 20.2056(b)-4(a), Estate Tax Regs.; emphasis added.]
Clearly, during the period in which the $ 500,000 bequest would be delayed, the surviving spouse would be unable to use that property to earn income. Thus, the surviving spouse's right to income from the bequest would be materially limited, requiring an accounting in accordance with section 20.2056(b)-4(a), Estate Tax Regs. [48] We therefore must determine the present value of the bequest, as of the valuation date prescribed by section 2032. *425 B. Determining the Present Value of the Bequest
As observed earlier, the bequest consisted of not only the ultimate receipt of $ 500,000, but also of interest payments to be made during the interim. [49] Accordingly, we must consider whether the right to such interest payments would adequately adjust for the surviving spouse's inability to immediately put the $ 500,000 to use. In the absence of any other information, an answer in the affirmative appears appropriate. Because the Estate was required to pay interest equal to at least the bequest's share of the Estate's income, it appears that, ultimately, the beneficiary would suffer no material limitation on the right to income from the property. [50]See sec. 20.2056(b)-4(a), Estate Tax Regs. *426 Nevertheless, respondent argues that, on the valuation date prescribed by section 2032, the present value of the bequest was $ 107,964.70 less than the $ 500,000 face value. However, respondent has failed to provide any justification for that computation. Not only has respondent failed to demonstrate how much income the surviving spouse might have received from the bequest, but respondent has failed to offer any reasonable basis for concluding such amount would not have been equaled or exceeded by the interest due her under the terms of the Will. Accordingly, insofar as respondent's valuation of the bequest is arbitrary and, moreover, petitioner has presented evidence sufficient to conclude (in the absence of any indication to the contrary) that the value of the bequest was the amount reported on the estate tax return, we hold for petitioner as to this issue. VI. Attorney's Fees
On Schedule J of the estate tax return, petitioner deducted $ 375,000 in attorney's fees as an administration expense. Respondent determined that $ 230,000 was a reasonable estimate and disallowed the remaining $ 145,000. Under section 2053(a)(2) of the Code and section 20.2053-3(c), Estate *427 Tax Regs., the Estate is entitled to a deduction for reasonable attorney's fees to the extent actually paid, at the time the estate tax return is filed, or to the extent reasonably expected to be paid. That regulation provides in part: The executor or administrator * * * may deduct such an amount of attorney's fees as has actually been paid, or an amount which at the time of filing may reasonably be expected to be paid. If on the final audit of a return the fees claimed have not been awarded by the proper court and paid, the deduction will, nevertheless, be allowed, if the district director is reasonably satisfied that the amount claimed will be paid and that it does not exceed a reasonable remuneration for the services rendered, taking into account the size and character of the estate and the local law and practice. * * * [Sec. 20.2053-3(c) (1), Estate Tax Regs.]
Therefore, we must determine, in light of the above, whether the attorney's fees claimed on the estate tax return are reasonable. A. Petitioner's Expert Testimony
Eugene Schreiber, Esq. (Schreiber), an attorney who has practiced in the trusts and estates field in the Baltimore area for approximately 30 *428 years, testified at trial as to the reasonableness of the attorney's fees claimed by petitioner. Petitioner listed Schreiber in its timely filed pretrial memorandum but did not cause a written report to be filed. Therefore, respondent argues, Schreiber's expert testimony is inadmissible under Rule 143(f)(1), which provides in pertinent part: Unless otherwise permitted by the Court upon timely request, any party who calls an expert witness shall cause that witness to prepare a written report for submission to the Court and to the opposing party. * * * An expert witness' testimony will be excluded altogether for failure to comply with the provisions of this paragraph, unless the failure is shown to be due to good cause and unless the failure does not unduly prejudice the opposing party * * *. [Emphasis added.]
Accordingly, respondent argues that Schreiber's testimony may only be admitted if petitioner's request was timely made, unless petitioner can show both good cause and the lack of undue prejudice to respondent. 1. Timely Request
Respondent argues that petitioner's request, made at trial, was untimely. Conceding that Rule 143(f) does not specify when *429 such request must be made, respondent argues that the request must be made pretrial. Respondent offers no authority for that proposition. In the absence of any additional guidance, there is no basis for reading in a strict pretrial requirement. On the contrary, it would appear that the Court is granted the flexibility to consider the competing interests and policies behind the Rule in determining what constitutes a timely request. Having determined that there is no per se rule requiring that a request, under Rule 143(f), be made prior to trial in order to be timely, we consider whether the request in this case was timely. We observe that the type of expert testimony here at issue -- regarding common industry practice -- is specifically mentioned in Rule 143(f)(2), which states: The Court ordinarily will not grant a request to permit an expert witness to testify without a written report where the expert witness' testimony is based on third-party contacts, comparable sales, statistical data, or other detailed, technical information. The Court may grant such a request, for example, where the expert witness testifies only with respect to industry practice or only in rebuttal *430 to another expert witness. [Emphasis added.]
Thus, Rule 143(f)(2), although not directly addressing the question of what constitutes a timely request, demonstrates a concern that when one party seeks to introduce expert testimony, which may be exceedingly complex and difficult for the layperson to readily understand, the other party must be given sufficient time to overcome those obstacles. Where, as here, the expert witness testifies as to the question of industry practice regarding attorney's fees, those concerns are particularly absent. Accordingly, we deem petitioner's request to have been timely made (and granted). The testimony of petitioner's expert witness is admissible. 2. The Testimony
Mr. Schreiber testified that all the attorney's fees and expenses incurred and paid by the Estate were reasonable for the Baltimore, Maryland, area. His conclusions were based upon consideration of the experience and ability of the attorneys, the complexity of the issues involved, the size of the estate and the amount of time required for administration. He also observed that the fees charged by petitioner's attorneys were at their usual billing rates and were well within *431 the range of rates in the Baltimore community. B. Reasonableness of the Fees
Respondent has offered nothing in support of his disallowance of $ 145,000 in attorney's fees. While it is possible, insofar as this Court has considered the matter, that such observation would be insufficient to justify a holding for petitioner, we also have petitioner's expert testimony to consider. Since petitioner's expert has offered credible testimony stating that the attorney's fees incurred were reasonable, and respondent has offered nothing to the contrary effect, we hold for petitioner. VII. Charitable Contribution Deduction
Decedent's will provides for contributions to two charitable lead trusts. Those contributions are to be determined pursuant to a formula. An element of the formula is a subtraction for administrative expenses of the Estate. In determining the contributions to the charitable lead trusts, respondent subtracted, in addition to the administration expenses allowed in the Notice of Deficiency, an additional $ 1 million for administration expenses, which she estimated have been or will be deducted on the Estate's fiduciary Federal income tax returns. Insofar as *432 the parties have stipulated that no administration expenses have been so deducted (as of January 31, 1990), and respondent has failed to offer any justification for the $ 1 million figure, petitioner argues that respondent's $ 1 million subtraction was arbitrary and improper. We agree and hold for petitioner on that issue. Decision will be entered under Rule 155. Footnotes
1. Unless otherwise noted, all section references are to the Internal Revenue Code of 1954 as in effect at the time of decedent's death, and all Rule references are to the Tax Court Rules of Practice and Procedure.↩
1. These are our calculations, which differ from those of one of petitioner's experts.↩
2. The Redemption Agreement did not explicitly state the number of shares to be redeemed upon decedent's death. Instead, that agreement provided that such number would be determined by dividing the lesser of (1) the sum of the amounts of net Federal estate tax and the credit for State death taxes as shown on the estate tax return, or (2) $ 5 million plus 10 percent of Fair Lanes' stockholders' equity in excess of $ 40 million -- by the per share purchase price to be paid for those shares. In no event, however, was the number of redemption shares to exceed 40 percent of decedent's shares held at death. Both parties agree that the result of that computation is 942,471 shares and we operate under that assumption.↩
3. The Redemption Agreement provided that, to the extent the purchase price was to be paid over 5 years (and if no inconsistent option were exercised), the purchase price would be payable in five equal annual installments, the first installment being due the earlier of 12 months from the date of closing or 14 months from decedent's death (that installment became due on Apr. 9, 1986), and the remaining payments being due annually, beginning 2 years from the date of closing (which date turned out to be Dec. 8, 1987), together with interest, paid on a quarterly basis, at the rate prescribed in sec. 6621(b). ↩
4. However, all options notwithstanding, the Redemption Agreement provided that the entire balance of the obligation would be paid within 6 years of the date of closing.↩
5. Of those 190,000 shares, 30,000 were offered by Fair Lanes itself and 160,000 were offered by selling shareholders. ↩
6. Legal, accounting, printing, and other costs to Fair Lanes and to the selling shareholders totaled 6.7 percent and 6.3 percent, respectively, in addition to the 9 percent underwriters' fee. Thus, the total costs of the 1971 offering to Fair Lanes and to the selling shareholders were 15.7 percent and 15.3 percent, respectively. ↩
7. Taking into account the decline in value from $ 13.125 and the underwriting, legal, accounting, printing, and other costs, Fair Lanes received 36 percent less than the mean bid-asked price for the 2 months immediately prior to the 1971 offering.↩
8. The Estate Block (2,443,458 shares) represents approximately 46 percent of the shares publicly held (5,354,722 shares). The average daily trades of Fair Lanes stock between Jan. 1, 1983, and Sept. 30, 1985, as reported by the National Association of Securities Dealers Automated Quotation Systems (NASDAQ), was 3,144 shares. The Estate Block, therefore, constitutes at least 777 times the average daily trade. ↩
9. Over the period from Aug. 5, 1985, to Aug. 15, 1985, the Dow Jones Industrial Average varied between a high of 1346.89 and a low of 1312.72, representing a difference of 3 percent. Over the same period, the closing price of Fair Lanes stock varied from $ 5.50 to $ 6.50, representing a difference of 18 percent. According to Simpson, a comparison of the day-to-day movements of the Dow Jones Industrial Average and of Fair Lanes stock demonstrates they moved substantially independently of one another.↩
10. Institutions held, in the aggregate, only 733,254 shares of Fair Lanes stock. At trial, Mr. Simpson added that, since the majority of those shares were being held for the members of a single family, only 204,754 shares of Fair Lanes were truly institutionally held.↩
11. The Ferris-Baker-Watts Report states that a secondary offering would have been undesirable because of the thin market in Fair Lanes stock and the lackluster outlook of the bowling industry. Moreover, the Ferris-Baker-Watts Report states that the Estate would have had difficulty engaging an underwriter to dispose of the stock and that, in any event, a significant discount with an attractive spread to the underwriter would be required to induce an underwriter to move the stock. The Ferris-Baker-Watts Report does not explain how substantial a discount would have been required, but estimates that underwriting fees of 8 percent and additional fees of 2 percent would have been required. In addition, the Ferris-Baker-Watts Report notes that the Board's consent and participation would have been necessary to a successful secondary offering.↩
12. The Ferris-Baker-Watts Report cites a study by the Securities & Exchange Comm. (SEC) finding that, for restricted shares of stock having unrestricted counterparts selling on the OTC market, the mean discount was 27.3 percent. See Institutional Investor Study Report of the Securities and Exchange Commission, Institutional Investors Study Report, Doc. No. 92-64, pt. 5, at 2444-2456 (1971). The Ferris-Baker-Watts Report further cites a 1976 study by J. Michael Maher, which compared prices paid for privately placed restricted stock with market purchases of their unrestricted counterparts, suggesting a 35.4 percent mean discount. See Maher, "Discounts for Lack of Marketability for Closely Held Business Interests", 54 Taxes 562 (1976). Additionally, the Ferris-Baker-Watts Report cites a study by Thomas Solberg, reviewing 15 cases where the courts valued restricted securities and discounted their value by a mean of 37.4 percent. See Solberg, "Valuing Restricted Securities: What Factors Do the Courts and the Service Look For", 51 J. Taxn. 150↩ (1979). There is no particularized reasoning in the report explaining why the 30-percent figure is appropriate, but it appears to be a round number falling within the range suggested by the aforementioned authorities.
13. As we compute Fair Lanes' operating margin for those years (shown above), the decline was from 21.4 percent in 1983 to 21.2 percent in 1984, and 19.4 percent in 1985. Both sets of figures demonstrate a decline in Fair Lanes' operating margins from 1983 to 1985. As amended by Evans' testimony at trial.
[1]↩4 The Whitman Report notes that "same store sales" were down and that revenue growth of existing operators was achieved largely through the acquisition of different units. Thus, the Whitman Report determines that increased revenues were misleading and that declining operating margins, suggesting a deterioration in Fair Lanes' earning capacity, were a more accurate measure of Fair Lanes' future prospects in 1985.
15. Typical covenants include: (1) Limitations on (a) indebtedness, (b) the pledging of assets to other creditors, (c) asset transfers, or (d) distributions or dividends to shareholders; (2) maintenance of (a) current and/or quick ratios, (b) minimum working capital, (c) minimum net worth, or (d) borrowing base; (3) reporting requirements; and (4) other provisions such as (a) a due-on-sale clause or (b) restrictions on mergers or consolidations. [1]6 The issuer would not be prohibited, for example, from providing existing or future creditors with a security interest in most or all of its assets or from distributing excessive dividends and other amounts to junior security holders, leaving insufficient assets left to pay issuer's unsecured debt.↩
17. A cross-default provision enables the holder of a debt instrument, whose terms have otherwise been satisfied, to call a default and accelerate collection upon the occurrence of a default in other securities of the issuer. [1]8 The Note provided that, in the event of any nonpayment of principal or interest due, there would be a 60-day period, following written notice of default, in which Fair Lanes could cure; upon expiration of that period, the balance of the Note could be declared immediately due and payable by the holder.↩
19. The Whitman Report observes that, given the risky nature of the Note, a rational investor would not permit more than 5 percent of his portfolio to be represented by such investment. Thus, if the Note were considered to be worth $ 2.18 million, as the Whitman Report concludes, the universe of buyers would be limited to investors with a portfolio exceedig $ 45 million.↩
20. The Trust Indenture Act of 1939 (the TIA), ch. 411, 53 Stat. 1149 (current version at 15 U.S.C. secs. 77aaa-77bbbb (1988)↩) governs the issuance of virtually all registered debt securities. The TIA established a uniform set of guidelines empowering an independent Trustee to enforce the rights and represent the interests of investors against an issuer. As described by the Whitman Report, the Trustee's duties include monitoring the issuer's compliance with any reporting requirements or covenants set forth in the indenture, providing security holders with notice of defaults under the indenture, and taking action on behalf of securities holders to enforce their rights. 21. The Whitman Report further notes that, aside from the risk of not being paid at all, uncertainty as to when↩ payment will be forthcoming makes an investment less attractive. Since a purchaser of this Note would not know whether payment would be immediate or deferred, such purchaser would require a higher interest rate than he would require on a similar security offering greater certainty.
22. The reported average weekly trading volume for the 4 weeks prior to Aug. 9, 1985, was 16,500 shares. Thus, average weekly volume immediately preceding the offering, as reported, would have represented less than 0.7 percent of the Estate's nonredemption shares and less than 0.3 percent of the combined shares of the Estate and Mrs. Nachlas.↩
23. As of August 9, 1985, 1 percent of the common stock would be 121,313 shares and the reported average trading volume would be 16,500 shares.↩
24. The Note provided for interest, paid quarterly, beginning Dec. 8, 1985, at the rate established by sec. 6621. That rate was 11 percent per annum, for the remainder of 1985, and 10 percent per annum for the first 6 months of 1986. Evans' assumption of a 10.5-percent overall interest rate may be a simple average of the known 11- and 10-percent rates, but is not explained. ↩
25. The Rebuttal computes the trading volume to total shares ratio to be 0.1 percent, a ratio lower than that of any of the IRS comparison companies.↩
26. According to the Rebuttal, only six of the IRS comparison companies had secondary offerings involving sale by shareholders only.↩
27. Four regressions were performed, comparing the Dow Jones Industrial Average with Fair Lanes': (1) High stock price quotes, (2) low stock price quotes, (3) average stock price quotes, and (4) closing stock price quotes. Specifically, the Rebuttal argues that there is no correlation, of any sort, as to the closing and low stock price quotes, and that there is a negative correlation as to the average and high stock price quotes.↩
28. The Rebuttal also notes that single or small groups of institutions frequently have significant ownership positions in companies, even though they lack working control.↩
29. Further, this is a New York Stock Exchange company, not subject to the NASDAQ "double-counting" effect. Double-counting is said to occur because brokers tend to report both purchases and sales, thereby giving the illusion of two sales where there is but one. Assuming complete double-counting, that company would be four times as active as Fair Lanes.↩
30. By comparison, the Potomac Report notes that 6-month U.S. Treasury notes were yielding 7.74 percent and 3-year U.S. Treasury notes were yielding 9.25 percent.↩
31. The Potomac Report qualifies that figure as possibly too high, because 6 cents per share of last year's earnings comprised equity method earnings from investments and not profits from operations. Stating that accounting earnings do not normally justify the same multiple as cash earnings, the Potomac Report suggests that the $ 3.60 constitutes a maximum price premised upon the assumption that "the public could be somewhat misled by the quality of those earnings." ↩
32. The Potomac Report cautions against reaching back 14 years for evidence as to how a specific stock might behave, but states that it does so in order to respond to the IRS's reliance on the 1971 offering in support of its conclusions. ↩
33. That figure does not take into account underwriters' fees or legal, accounting, printing, and other expenses.↩
34. The Potomac Report observes that, at that time, the U.S. Treasury yield was 8.78 percent for 6 months and 9.15 percent from 12 months. In February 1985, the Potomac Report states, virtually no private financing would have yielded less than 1 percent per month, and many such rates were substantially higher.↩
35. The Potomac Report states that a buyer's best guess at the time would be that the variable rate would be at or close to 10 percent, and adds that, by December 1985, warning signs were already suggesting a likely drop in that rate. ↩
36. As noted earlier, Intermediate Term Government Bonds paid 11.31 percent; Corporate Bonds ranged from Aaa, paying 12.08 percent to Baa, paying 13.26 percent and averaging 12.64 percent; and Salomon Brothers High Yield Debt yielded 15.97 percent. ↩
37. The Potomac Report adds that, even assuming an investor had the inclination to buy the Note, such investor likely would lack sufficient cash. The Potomac Report bases that conclusion upon its agreement with the Whitman Report's discussion respecting the difficulty an investor would have in financing (borrowing against) the Note.↩
38. The brokerage fees were arrived at using a "Lehman" formula, comprised of 5 percent on the first $ 1 million of value of the asset, 4 percent on the second $ 1 million, and 3 percent on the third $ 1 million, or part thereof.↩
39. The contributions to such trusts are determined under a formula whereby certain gifts under the will, taxes, administration expenses, and $ 100 are subtracted from the probate estate for the purpose of such determination.↩
40. Moreover, the Court in Kirchner, Moore & Co. v. Commissioner, 54 T.C. 940, 944 n.2 (1970), affd. 448 F.2d 1281↩ (10th Cir. 1971), rejected part of the stipulation primarily because it was contrary to the facts of the record. No such contrary facts have been produced in this case.
41. This is the figure appearing in the IRS Report as originally written. As stated, Evans stated at trial that this figure should be reduced by approximately $ 170,000.00, to $ 3,861,094.99.↩
42. Petitioner advises the Court that when a security is traded over the counter it is difficult to establish actual sales prices, since only bid and asked prices are published. However, whether $ 5.375 is the mean selling price, or merely the mean bid and asked price, is irrelevant, since sec. 20.2031-2(c)↩, Estate Tax Regs., permits the use of bid and asked prices and both parties have treated $ 5.375 as the fair market value, per share, of Fair Lanes stock on the alternate valuation date.
43. We further observe that the Whitman Report, which ultimately determines those shares to be worth $ 8,500,000, also determines that such shares would be worth $ 8,725,000 if sold pursuant to SEC Rule 144. The Whitman Report does not explain why such shares must not therefore be worth that amount, even if some other means of disposal would not retrieve the same sum. Without relying on this observation, we note that this understanding of the Whitman Report lends additional credence to the higher estimate made by Baker-Watts Report and the Ferris-Baker-Watts Report.↩
44. Under the doctrine of equitable recoupment, where the Government attempts to tax the same transaction twice on two inconsistent legal theories, a taxpayer may set off against one tax a refund of the other tax, which may not be independently recovered due to the expiration of the statute of limitations. SeeUnited States v. Dalm, 449 U.S. 596, 110 S. Ct. 1361 (1990); Bull v. United States, 295 U.S. 247↩ (1935).
45. Respondent does not argue that, under sec. 2035(d)(2), the insurance proceeds are includable because such proceeds would have been includable under sec. 2042, had the insurance policies been retained by decedent. In fact, respondent has conceded that, in the event sec. 2042 does not apply, no portion of the insurance proceeds is includable under sec. 2035. Petitioner argues that, insofar as sec. 2035(d)(2) merely nullifies sec. 2035(d)(1), with respect to certain transfers such as the one here at issue, it does no more than restore the status quo, leaving sec. 2035(a)↩ intact precisely as it was before the Economic Recovery Tax Act of 1981, Pub. L. 97-34, 95 Stat. 172.
46. We have no occasion to consider respondent's concession that if sec. 2042 does not apply, the insurance proceeds, in their entirety, are excluded from the gross estate by virtue of sec. 2035(d)(1) nullifying sec. 2035(a)↩. Petitioner, aside from noting in its reply brief that the taxable estate ought to be reduced if respondent is correct, has not formally alleged an overpayment or setoff on account of the partial inclusion of the insurance proceeds. Accordingly, that issue is not before this Court.
47. However, if the imputed interest rate is less than or equal to the actual rate of interest contemplated by decedent's will, no additional discount would be required. ↩
48. Sec. 20.2056(b)-4(b), Estate Tax Regs., provides additional support for the proposition that some adjustment for delayed payment is appropriate. ("If an obligation is imposed upon the surviving spouse by the decedent in connection with the passing of a property interest, the value of the property interest is to be reduced by the amount of the * * * obligation.") The delayed bequest situation is in relevant respects indistinguishable from one in which decedent's spouse receives the bequest immediately, but is required to pay all or some portion of any interest on it, for the next 5 years, to the estate. Clearly, sec. 20.2056(b)-4(b), Estate Tax Regs., would require, in the latter situation, that the value of the bequest be reduced by the value of such interest payments. Since it is immaterial whether decedent's spouse receives the interest and subsequently pays it to the estate, or never receives it at all, sec. 20.2056(b)-4(b), Estate Tax Regs., should apply equally to the former situation -- which is the present case.↩
49. Pursuant to the Will, the Estate was to pay interest, payable at least monthly, at the greater of (i) the bequest's statutory share of the Estate's income pursuant to the Annotated Statutory Code of Maryland or (ii) 75 percent of the prime rate at the First National Bank of Maryland. ↩
50. Of course, respondent might show, in a given case, that the bequest's share of the Estate's income is too low to approximate the income that the bequest, in the hands of the intended beneficiary, might have produced. However, we speak here merely of a reasonable assumption in the absence of such information.↩